**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. (Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008) http://www.gaappeals.us/rules/

**October 9, 2012**

# In the Court of Appeals of Georgia

A12A1260. MANHERTZ v. THE STATE.

A12A1558. JOYNER v. THE STATE.

DILLARD, Judge.

Following a jury trial, Kirk Manhertz and his co-defendant, Nicole Joyner, were both convicted on twelve counts of identity fraud. Manhertz was also convicted on one count of giving a false name to a law-enforcement officer and one count of driving without a license. On appeal of their convictions, Manhertz contends that the trial court erred in denying his claim that his trial counsel rendered ineffective assistance, and Joyner contends that the evidence was insufficient to support her convictions. Because the charges arose from the same incident and the defendants were tried together, we have consolidated their separate appeals for review. And for the reasons set forth *infra*, we affirm in both cases.

Viewed in the light most favorable to the jury's guilty verdicts,[1] the record shows that on March 27, 2008, a Henry County police officer on traffic patrol observed a black Lexus with New York license tags and noticed that the driver was not wearing a seatbelt. Consequently, the officer initiated a traffic stop and, after approaching the vehicle, asked the driver to produce his driver's license. The driver responded that he did not have his driver's license but that his name was Glenroy Hardie. However, when a computer check on that name turned up no information, and the driver appeared nervous, the officer asked the driver to exit the vehicle. The officer then asked if he could search the vehicle, and the driver consented. During his search, the officer found an identification card with a photograph of the driver. The card indicated that the driver's name was Kirk Manhertz and that he resided at 363 Interlake Place, McDonough, Georgia, which is in Henry County. In addition, the officer found several credit cards in the vehicle, all of which bore names different from either Manhertz or Hardie.

Based on the search of Manhertz's vehicle, the police suspected that he was involved in an identity-fraud scheme and, thus, police arrested him and obtained a warrant to search the McDonough address listed on Manhertz's identification card.

---

[1] *See, e.g.*, *Goolsby v. State*, 299 Ga. App. 330, 330-31 (682 SE2d 671) (2009).

During the search of that residence, the police found a ledger, which had the name "Kane" on the front and which contained people's names and other identifying information such as social-security and driver's-license numbers. The police also found copies of numerous checks, all of which were made payable to the Point at Perimeter apartment complex in DeKalb County, and papers that contained the names, social-security numbers, and driver's-license numbers of the individuals identified on the checks. Additionally, the police found a New York identification card for Manhertz and more credit cards.

Approximately two months later, an investigator with the Henry County District Attorney's office began attempting to track down the apparent victims of Manhertz's identity-fraud scheme. Consequently, the investigator met with a regional supervisor for the company that owned the Point at Perimeter apartment complex and the complex's property manager at another apartment complex owned by the company to determine if they knew the people whose copied checks were found at Manhertz's residence or if they recognized the handwriting on the list of names and identifying information. The property manager confirmed that the copied checks were those of current and former tenants, and he recognized the handwriting on the list of names and identifying information as that of his assistant, Nicole Joyner. Based on

3

this conversation, the investigator asked to speak with Joyner, so the property manager went to the Point at Perimeter complex where Joyner was currently working and brought her back to the sister property for questioning.

As the recorded interview began, the investigator told Joyner that he was investigating an identity-fraud scheme involving some of the apartment complex's tenants. The investigator then asked Joyner if she recognized the name Manhertz or a photograph of him, but she replied that neither was familiar. When confronted with the handwritten list of tenants' identifying information, Joyner admitted that the handwriting was hers, but she initially denied compiling the information for any nefarious purpose. Eventually, however, Joyner confessed that she provided the copied checks and tenants' identifying information to someone after being promised cash in exchange for same.

Specifically, Joyner explained that she met a dancer at a strip club, who went by the stage name Paradise. After a brief conversation, Paradise asked Joyner how she was employed, and Joyner informed her that she worked as an assistant manager at an apartment complex. Paradise responded by informing Joyner that she had a friend named Kane, who would pay $1,000 for tenants' names, social-security numbers, driver's-license numbers, and copies of signed checks. Joyner agreed to do so and

4

later provided Paradise with the requested information. However, Joyner asserted that she was never paid any money. And although Joyner claimed that she went back to the strip club on one or two occasions in an attempt to collect the promised payment, she was unable to find Paradise—no doubt finding little comfort in the axiom that "solitude sometimes is best society."[2] Other than her physical description and place of employment, the only information about Paradise that Joyner could provide to the investigator was that she drove a black Lexus with New York license plates.

Thereafter, Manhertz and Joyner were jointly indicted in the Superior Court of Henry County with fourteen counts of identity fraud,[3] and in the same indictment, Manhertz was also charged with one count of giving a false name to a law-enforcement officer,[4] and one count of driving without a license.[5] Following a pre-trial *Jackson-Denno* hearing, the trial court ruled that the investigator's recorded interview of Joyner was admissible at trial. And during that same pre-trial hearing,

---

[2] John Milton, Paradise Lost 234, bk. IX, ll. 249 (G. Routledge and sons ed. 1905) (1674).

[3] *See* OCGA § 16-9-121 (a) (1).

[4] *See* OCGA § 16-10-25.

[5] *See* OCGA § 40-5-20 (a).

5

the trial court heard and denied Joyner's motion to sever her trial from Manhertz's trial.

During the joint trial, the police officers involved in the investigation of the case testified, as did twelve former tenants of the Point at Perimeter apartments who were victims of the identity-fraud scheme. In addition, the District Attorney's investigator testified regarding his interview of Joyner, and prior to the audio recording of the interview being played, the trial court instructed the jury that Joyner's out-of-court statement to the investigator could only be considered against her. Neither Manhertz nor Joyner testified in their own defense, and at the conclusion of the trial, the jury found both of them guilty on twelve counts of identity fraud.[6] The jury also found Manhertz guilty on the giving-a-false-name and driving-without-a-license counts.

Subsequently, both Manhertz and Joyner filed motions for new trial. In Manhertz's motion, he argued, *inter alia*, that his trial counsel rendered ineffective assistance. In her motion, Joyner argued, *inter alia*, that the State failed to prove

---

[6] Two of the identity-fraud counts were dismissed because the victims currently resided outside the State and could not attend the trial.

venue beyond a reasonable doubt. The court held separate hearings on the respective motions and ultimately denied both. These appeals follow.

1. Manhertz contends that his trial counsel rendered ineffective assistance by failing to raise a *Bruton*[7] objection when Joyner's recorded interview was played during trial. We disagree.

In order to prevail on his claim of ineffective assistance of counsel, Manhertz must show that "counsel's performance was deficient and that the deficient performance so prejudiced [him] that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different."[8] Furthermore, there is a strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct, and a criminal defendant must overcome this presumption.[9] Unless clearly erroneous, we will uphold a trial court's factual

---

[7] *See Bruton v. United States*, 391 U.S. 123 (88 SCt 1620, 20 LE2d 476) (1968).

[8] *Chapman v. State*, 273 Ga. 348, 349-50 (2) (541 SE2d 634) (2001); *see Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

[9] *Chapman*, 273 Ga. at 350 (2).

7

determinations with respect to claims of ineffective assistance of counsel; however, a trial court's legal conclusions in this regard are reviewed de novo.[10]

Here, Manhertz argues that the portion of Joyner's statement in which she claimed that the dancer Paradise told her that a person named Kane would pay her for her apartment tenants' vital information violated his Sixth Amendment right of confrontation under *Bruton*. Specifically, Manhertz argues that Joyner's statement lead the jury to believe that he was Kane and, therefore, because he could not cross-examine Joyner or Paradise, his trial counsel's failure to object to this portion of Joyner's recorded interview constituted ineffective assistance. We disagree.

It is well established that under the Confrontation Clause, a criminal defendant has "the right to confront witnesses against him and to cross-examine them."[11] And when a jury is instructed that certain testimony or evidence may only be considered against a co-defendant, the jury is "presumed to follow the court's instruction and the testimony or evidence is not considered to be against the defendant."[12] However, in *Bruton*, the Supreme Court of the United States

---

[10] *Henderson v. State*, 303 Ga. App. 898, 898 (1) (695 SE2d 334) (2010).

[11] *Moss v. State*, 275 Ga. 96, 98 (2) (561 SE2d 382) (2002).

[12] *Id.* (punctuation omitted).

8

recognized a narrow exception to this principle, by holding that when a facially, powerfully incriminating statement of a non-testifying co-defendant is presented to the jury, the risk is so great the jury will ignore the limiting instruction and consider the co-defendant's confession against the defendant that the general rule cannot be followed.[13]

Accordingly, our Supreme Court has held that "the introduction of such statements, even with a limiting instruction, violates the defendant's right of confrontation."[14]

In contrast to the "powerfully incriminating statements of a co-defendant" at issue in *Bruton*, the Supreme Court of the United States in *Richardson v. Marsh*[15] held that "when a co-defendant's statement does not directly incriminate the defendant and the jury is required to draw inferences to connect the statement to the defendant, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence."[16] Our Supreme Court has, therefore, held that *Bruton* only "excludes statements by a non-testifying co-defendant that directly

---

[13] *Id.* (citation and punctuation omitted); *see Richardson v. Marsh*, 481 U.S. 200, 207 (II) (107 SCt. 1702, 95 LE2d 176) (1987); *Bruton*, 391 U.S. at 135-36.

[14] *Moss*, 275 Ga. at 98 (2); *see Bruton*, 391 U.S. at 135-36.

[15] 481 U.S. 200 (107 SCt 1702, 95 LE2d 176) (1987).

[16] *Moss*, 275 Ga. at 98 (2) (punctuation omitted); *see Richardson*, 481 U.S. at 208.

inculpate the defendant, and that *Bruton* is not violated if a co-defendant's statement does not incriminate the defendant on its face and only becomes incriminating when linked with other evidence introduced at trial."[17]

Here, Joyner's statement did not clearly inculpate Manhertz. In fact, at the beginning of the interview, Joyner told the investigator that she did not recognize Manhertz's name or his photograph. And while Joyner's statement did implicate the person named "Kane" in the identity-fraud scheme, there was no direct evidence that Kane and Manhertz are the same person. Indeed, Joyner's mention of the name Kane only became incriminating when linked with other evidence introduced at trial. Thus, Joyner's statement did not violate *Bruton*.[18] Given the foregoing circumstances, and

---

[17] *Moss*, 275 Ga. at 98 (2); *see Thomas v. State*, 268 Ga. 135, 137-38 (6) (485 SE2d 783) (1997) ("For the admission of a co-defendant's statements to constitute a *Bruton* violation the statements *standing alone* must *clearly inculpate* the defendant." (punctuation omitted)); *Garlington v. State*, 268 Ga. App. 264, 267-68 (1) (a) (601 SE2d 793) (2004).

[18] *See Moss*, 275 Ga. at 99 (2) (holding that admission of non-testifying co-defendant's statement to police that murder defendant came to his apartment and went in bathroom and stayed there for awhile did not violate *Bruton* rule because statement, standing alone, did not clearly incriminate defendant but only became incriminating when linked with other evidence); *Thomas*, 268 Ga. at 137-38 (6) (holding that co-defendant's statement, that at time of defendant's arrest for kidnapping, which was unrelated to shootings for which defendant was now on trial, defendant had a pistol, which he had bought, did not clearly inculpate defendant and, thus, did not constitute *Bruton* error).

the fact that the trial court instructed the jury that Joyner's statement was only to be considered against her, if Manhertz's trial counsel had objected to the statement on *Bruton* grounds, that objection would have been wholly lacking in merit.[19] And as we have repeatedly held, the failure to "pursue a futile objection does not amount to ineffective assistance."[20] Accordingly, Manhertz failed to show that his trial counsel provided ineffective assistance.

2. Joyner contends that the evidence was insufficient to prove beyond a reasonable doubt that she was a party to the crime of identity fraud in Henry County. In essence, Joyner argues that although she could have been tried on identity-fraud charges in DeKalb County, where the victims resided, because she did not have any connection to Manhertz and did not possess the victims' identifying information outside of DeKalb County, the evidence was insufficient to prove that she committed identity fraud in Henry County. This argument is a nonstarter.

_____

[19] Although in this appeal, Manhertz argues that his trial counsel rendered ineffective assistance by failing to make a *Bruton* objection to Joyner's statement, an objection solely on hearsay grounds would have similarly lacked merit. *See Munsford v. State*, 235 Ga. 38, 43-44 (218 SE2d 792) (1975) (holding that when the testimony relating each of the statements by co-defendants was admissible against at least one of the co-defendants, the statements were not rendered inadmissible because each statement would be hearsay as to the other two defendants).

[20] *Ventura v. State*, 284 Ga. 215, 218 (4) (663 SE2d 149) (2008).

11

At the outset, we note that when a criminal conviction is appealed, the evidence must be viewed in the light most favorable to the verdict, and the appellant no longer enjoys a presumption of innocence.[21] In evaluating the sufficiency of the evidence, we do not weigh the evidence or determine witness credibility, but "only determine whether a rational trier of fact could have found the defendant guilty of the charged offenses beyond a reasonable doubt."[22] Accordingly, a jury's verdict will be upheld "[a]s long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case. . . ."[23]

Under OCGA § 16-9-121, "[a] person commits the offense of identity fraud when he or she willfully and fraudulently [w]ithout authorization or consent, uses or possesses with intent to fraudulently use identifying information concerning a person. . . ."[24] As used in the financial-identity-fraud statutes, the term "identifying information" includes current names, social-security numbers, driver's-license

---

[21] *See, e.g.*, *English v. State*, 301 Ga. App. 842, 842 (689 SE2d 130) (2010).

[22] *Joiner v. State*, 299 Ga. App. 300, 300 (682 SE2d 381) (2009); *see also Lott v. State,* 303 Ga. App. 775, 775 (1) (694 SE2d 698) (2010).

[23] *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001) (punctuation omitted).

[24] OCGA § 16-9-121 (a) (1).

12

numbers, and birth dates.[25] And with regard to venue, the Georgia Constitution and our statutory law require that a criminal defendant must be tried in the county in which the alleged crime was committed.[26] However, under the financial-identity-fraud statutes, a "crime will be considered to have been committed in any county where the person whose means of identification or financial information was appropriated resides or is found, or in any county in which any other part of the offense took place, regardless of whether the defendant was ever actually in such county."[27]

Here, Manhertz and Joyner were charged with twelve counts of identity fraud in that they "unlawfully, willfully and fraudulently, without the authorization and consent of [twelve different individuals], possess, with intent to fraudulently use, identifying information concerning [those individuals], to wit: [their] social security number[s], date[s] of birth and Georgia driver's license number[s] . . . ." In support of these charges, the State introduced Joyner's own statement, in which she admitted to providing the identifying information of several current and former tenants of the Point at Perimeter apartment complex to a third party who promised her $1,000 if she

---

[25] OCGA § 16-9-120 (4) (A), (B), (C), (L).

[26] *See* Ga. Const. 1983, Art. VI, Sec. II, Par. VI; OCGA § 17-2-2 (a).

[27] OCGA § 16-9-125.

13

did so. And although Joyner argues that there was no evidence, other than victims' identifying information in his possession, connecting her to Manhertz, pursuant to OCGA § 16-2-20, "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."[28] More specifically, a person is "concerned in the commission of a crime" if [she] intentionally aids or abets in the commission of the crime."[29] And it is possible for various persons to be parties to "a single [criminal] agreement (and thus one conspiracy) even though they do not know the identity of one another, and even though they are not all aware of the details of the plan of operation."[30] Thus, the evidence was sufficient to support the jury's verdict that Joyner either directly or as a party to a crime committed identity fraud.[31]

Furthermore, as to Joyner's venue argument, the State introduced evidence that the victims' identifying information was found in the Henry County residence of Manhertz, and twelve of the victims testified at trial that they did not authorize any

---

[28] OCGA § 16-2-20 (a).

[29] OCGA § 16-2-20 (b) (3).

[30] *Kilgore v. State*, 251 Ga. 291, 299 (3) (c) (305 SE2d 82) (1983).

[31] *See Zachery v. State*, 312 Ga. App. 418, 420 (1) (718 SE2d 332) (2011).

14

such use of their identifying information. Based on these circumstances, and the fact that Joyner admitted in her statement that she was a party to the crime in that she provided the victims' identifying information to an unauthorized third party, the evidence was sufficient to allow the jury to find that at least part of the identity fraud took place in Henry County, regardless of whether Joyner was ever actually in that county.[32]

*Judgment affirmed. Ellington, C. J. concurs. Phipps, P. J., concurs in judgment only.*

---

[32] *See* OCGA § 16-9-125.