## S08A0074. VENTURA v. THE STATE.
### (663 SE2d 149)

MELTON, Justice.

Following a jury trial, Juan Hernandez Ventura was found guilty of malice murder in connection with the shooting death of Franklin Paguada.[1] On appeal, Ventura contends that the evidence was insufficient to sustain his conviction, that the trial court erred in admitting into evidence statements that he made to police and statements that the victim made after being shot, and that his trial counsel was ineffective. We affirm.

1. Viewed in the light most favorable to the verdict, the evidence reveals that at 3:13 a.m. on October 21, 2001, Cobb County Police Officer Anthony Vazquez pulled over Freddie Castro for driving with his lights off and swerving. At the time, Castro was accompanied by Paguada and one other passenger. Officer Vazquez, assisted by Officer C. J. Mabe, arrested Castro for DUI. The officers impounded the vehicle and allowed Paguada and the other passenger to walk away.

Just before the passengers were allowed to walk away, Officer Vazquez received a call about a robbery in progress across the street at Summit Creek Apartments. Officer Mabe responded to the call. Another officer, Allen Collar, also responded to the call. At the scene of the purported robbery, Officers Mabe and Collar found Ventura, who was highly intoxicated, standing near a small white car with one of its doors open. Ventura told the officers that two men had stolen $1,000 and a .40 caliber pistol from him. Officer Mabe took a report. Officer Collar searched the area, but found nothing, and the officers left the scene.

---

[1] On April 1, 2002, Ventura was indicted for malice murder and felony murder (with aggravated assault as the underlying offense). Following a jury trial on September 29-October 3, 2003, Ventura was found guilty of malice murder and sentenced to life imprisonment. Ventura filed a motion for new trial on October 8, 2003, which he amended on March 29, 2004. The trial court denied Ventura's motion for new trial on April 12, 2007. Ventura's appeal was docketed in this Court on September 14, 2007, and orally argued on January 14, 2008.

About an hour later, Ventura called the police, saying that he had one of the robbery suspects in custody in the back of his truck at the Summit Creek apartment complex. Officers Mabe and Collar went to the scene, where they found Ventura, still intoxicated, holding Paguada at gunpoint, with Paguada sitting in the back of a truck. Ventura handed his .32 caliber Smith & Wesson to Officer Mabe, who unloaded it and gave the empty weapon to Ventura's son, who was also at the scene. The officer recognized that Paguada could not have been involved in the alleged armed robbery because, at the time that the robbery had allegedly occurred, Paguada was involved in the DUI traffic stop across the street. Paguada did not want to pursue the incident, and he left, walking south on Six Flags Drive. Officer Mabe asked Ventura's son to park the truck, take Ventura inside, and help him sober up.

At about 4:55 a.m., Ventura's neighbor, Darrell Lowe, saw Ventura sitting in a small red car in the apartment complex parking lot. Ventura told Lowe that he had been robbed, and that he had called the police, but the police did not really do anything. Lowe told Ventura to let the police handle the matter, but Ventura showed Lowe a handgun and said that he would handle it himself. Ventura then drove off in the red car.

A small car stopped near Paguada as he was walking along Six Flags Drive, and the person inside the car fired two shots at him. Paguada was shot once in the chest. Paguada tried to continue walking after being shot, but collapsed and lost consciousness in some bushes when he was no longer able to do so. When Paguada's friends, the Moradel brothers, found him on Six Flags Drive at around 1:00 p.m. on October 21, 2001, Paguada was still alive. Paguada told the Moradel brothers to take him to the hospital. While the Moradel brothers drove him to the hospital, he informed them that, although he did not know the man's name, the man who had shot him was the same one who had earlier accused him of stealing a gun and had called the police to the scene. Paguada also gave a description of the shooter that matched Ventura, and further identified the shooter as "Chispero's brother." Ventura's brother's nickname was "Chispero." Paguada later died at the hospital from his gunshot wound.

The evidence was sufficient to enable a rational trier of fact to find Ventura guilty of murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); OCGA § 16-5-1 (a).

2. Ventura contends that the trial court erred in admitting into evidence statements that Paguada made to the Moradel brothers several hours after he had been shot. However, "[d]eclarations by any person in the article of death, who is conscious of his condition,

as to the cause of his death and the person who killed him, shall be admissible in evidence in a prosecution for the homicide." OCGA § 24-3-6. For testimony to be admissible as a dying declaration,

> [i]t need only appear to the court from the circumstances of the case that there was a probability that the deceased was conscious of his condition at the time he made the statement. The testimony . . . need not contain any statement by the deceased to the effect that he was conscious of impending death at the time the declarations were made, since this may be inferred from the nature of the wounds and other circumstances.

(Citations and punctuation omitted.) *Woodard v. State,* 278 Ga. 827, 829 (3) (607 SE2d 592) (2005).

Here, the record reveals that Paguada lost consciousness because he could no longer continue to walk after having suffered a gunshot wound to the chest. When he was found several hours later by the Moradel brothers, Paguada knew that he needed immediate medical attention and that the man who had shot him was the same one who had earlier accused him of stealing a gun. Paguada was also in such extreme pain after being shot that he could not turn his head to face the Moradel brothers while he was trying to tell them what had happened, which forced one of the brothers to lean in close to Paguada's face in order to hear what he was saying. These circumstances were sufficient to establish a prima facie showing for the admission of Paguada's statements as his dying declarations. *Woodard,* supra, 278 Ga. at 829 (3). See also *Morgan v. State,* 275 Ga. 222 (5) (564 SE2d 192) (2002).

3. Ventura argues that the trial court erred in admitting into evidence various statements that he made to police after he had been arrested and was being placed into his jail cell. However, the record reveals that Ventura spontaneously made these statements, and that he was not asked any questions by police to elicit them. Specifically, as a police officer was closing the door to Ventura's jail cell, Ventura spontaneously started making references to "guys [who] had stolen his .40 pistol," the fact that the police had not been helpful when he called them, the fact that he had "put [the guy] in his truck and [had gone to get] the little gun," and the fact that "he was in the army . . . [and] needed to protect his family." Because Ventura spontaneously made these statements, and because the statements were not made in connection with any police interrogation, the trial court did not err in admitting them into evidence. *Tennyson v. State,* 282 Ga. 92 (3) (646 SE2d 219) (2007).

4. Ventura asserts that his trial counsel was ineffective for failing to (a) make additional arguments to show that Paguada's statements were not admissible as his dying declarations; (b) call his defense expert as a witness at trial; (c) call a 911 operator as a witness at trial; (d) call as a witness a police officer who believed that Paguada might have been held up by three black males; and (e) call two of the Moradel brothers as witnesses at trial. In order to succeed on a claim of ineffective assistance, Ventura must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). If an appellant fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. Id. at 697 (IV); *Fuller v. State*, 277 Ga. 505 (3) (591 SE2d 782) (2004). In reviewing the trial court's decision, " 'we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

With respect to counsel's failure to make additional arguments for the exclusion of Paguada's statements, as shown in Division 2, supra, the trial court did not err in admitting Paguada's statements into evidence as his dying declarations. Therefore, additional arguments against the admission of this evidence would have been futile. The failure to pursue a futile objection does not amount to ineffective assistance. *Judkins v. State*, 282 Ga. 580 (5) (652 SE2d 537) (2007).

Regarding counsel's failure to call various additional witnesses to testify at trial, "[s]trategic decisions regarding . . . which witnesses to call are within the exclusive province of the attorney after consultation with the client and do not amount to ineffective assistance." (Citation omitted.) *Smith v. State*, 283 Ga. 237, 240 (2) (c) (657 SE2d 523) (2008). At the motion for new trial hearing, trial counsel testified that he did not call the police officer as a witness because the officer was "wishy-washy" about his recollection of events, and that therefore the officer's testimony would not have been helpful to Ventura. Counsel also testified that, after allowing the defense expert to review the victim's medical records, he made a strategic decision not to call the expert as a witness at trial. This decision was reasonable, as the expert had already conceded at a pre-trial motion in limine hearing one of the very points that he had been hired to refute. Specifically, the expert had been hired to show that Paguada might not have been coherent at the time that he made his alleged dying declarations to the Moradel brothers, which could have made Paguada's statements inadmissible at trial. See OCGA § 24-3-6 (person in the article of death must have been conscious of

his condition for dying declarations to be admissible). However, the expert conceded while being questioned by the State at the motion in limine hearing that Paguada's medical records indicated that he was coherent and thinking clearly at the time that he made his dying declarations, which refuted the defense expert's theory that Paguada had lost too much blood in order to have been thinking clearly at the time that he made his statements to the Moradel brothers. Thus, the failure to call the expert and the police officer as witnesses at trial did not amount to ineffective assistance. See *Smith*, supra, 283 Ga. at 239-240 (2) (a), (c). With respect to counsel's failure to call a 911 operator and two of the Moradel brothers as witnesses at trial, Ventura did not question his trial counsel at the motion for new trial hearing about what these witnesses would have allegedly testified to had they testified at trial. Nor did these witnesses testify at the motion for new trial hearing. Therefore, Ventura cannot rebut the reasonableness of trial counsel's tactical decision not to call these witnesses, nor can he establish that his defense was prejudiced by counsel's failure to call these witnesses. See, e.g., *Boseman v. State*, 283 Ga. 355, 359 (3) (659 SE2d 364) (2008).

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 30, 2008 —
RECONSIDERATION DENIED JULY 25, 2008.

*Hall, Booth, Smith & Slover, J. Louise Dietzen, Kevin A. Leipow, J. Brown Moseley,* for appellant.

*Patrick H. Head, District Attorney, Amelia G. Pray, Dana J. Norman, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Elizabeth A. Harris, Assistant Attorney General,* for appellee.