**THIRD DIVISION
ANDREWS, P. J.,
DILLARD and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/**

**June 12, 2013**

# In the Court of Appeals of Georgia

A13A0289, A13A0290. BETANCOURT v. THE STATE; HERNANDEZ v. THE STATE.

DILLARD, Judge.

Edgar David Betancourt and Oscar Hernandez (collectively, "appellants") were jointly tried and convicted on one count of trafficking in cocaine, in violation of OCGA § 16-13-31 (a), and Hernandez alone was convicted on one count of obstruction of a law-enforcement officer, in violation of OCGA § 16-10-24 (a). In these companion appeals, appellants argue that the trial court erred in denying their motions to suppress physical evidence and in allowing the admission of similar-transaction evidence, and that their respective trial counsel rendered ineffective assistance. For the reasons set forth *infra*, we affirm in both cases.

Viewed in the light most favorable to the jury's verdict,[1] the evidence presented at trial shows that on the afternoon in question, a police officer with the Gwinnett County Police Department observed a vehicle traveling northbound on Interstate 85 with unlawfully dark window tinting. And as the officer began to follow the vehicle, he noticed that it had a Massachusetts license plate that was partially obscured and that the driver was following too closely to the car in front of it. As a result, the officer initiated a stop of the vehicle.

Upon approaching the vehicle, the officer detected a strong odor of air freshener and observed that there was only a single key in the ignition and religious insignia throughout its interior (the relevance of which is noted *infra*). He requested the license and registration of the driver, Betancourt, and immediately noticed that his license was issued by Rhode Island. The officer began to ask questions in an attempt to establish the ownership of the vehicle due to the equipment violations and the Massachusetts registration; however, each of the officer's questions was answered by the passenger, Hernandez—who indicated that the vehicle belonged to a friend.

The officer then requested that Betancourt exit the vehicle, attempted to explain the reason for the stop, and sought to obtain additional information about the

---

[1] *See King v. State*, 317 Ga. App. 834, 836 (733 SE2d 21) (2012).

vehicle's owner. Betancourt, who the officer described as "quite nervous," indicated that he did not understand English. The officer thereafter called for an interpreter from a nearby police department, returned to Hernandez to explain the reason for the stop, and retrieved Hernandez's license, which was also issued by Rhode Island.

The officer then attempted to verify the appellants' identities and Betancourt's license status several times, but experienced a delay due to the computer system—a fact he confirmed by calling the police department's radio room. The officer testified that he needed to obtain this information to complete the traffic citations and to verify whether Betancamp's license was valid or suspended. And as he returned to Hernandez to explain the reason for the delay, the officer asked Hernandez if the car contained any illegal weapons or drugs, to which Hernandez responded, "no, my friend, you can go ahead and check."

While the officer was completing his paperwork and waiting for the results of the computer check on appellants' licenses, a Spanish-speaking officer arrived on the scene approximately 20 minutes after the initial stop. The first officer directed the translating officer to request Betancourt's consent to search the vehicle, and Betancourt authorized the search contingent upon Hernandez's consent. The first officer then returned to Hernandez and again asked if the vehicle contained any

3

illegal weapons, drugs, or currency. When Hernandez answered in the negative, the officer requested permission to search and Hernandez responded, "[s]ure, no problem, my friend."

The first officer then conducted a search of the vehicle and located a hidden compartment constructed underneath the backseat. And while he could not access the compartment at the time, he inserted a small flashlight and was able to see shrink-wrapped green cellophane packages which, based upon his training and experience, he believed to contain contraband. The officer signaled to the translating officer, who had moved to a shaded woodline with Betancourt, and upon seeing this signal, Betancourt fled. After a brief foot chase, Betancourt was apprehended. Hernandez, who did not attempt to flee, was also arrested at the scene.

The hidden compartment was later discovered to contain 5.085 kilograms of cocaine consisting of 66.5 percent purity, which had a street value estimated to be approximately $125,000.

Thereafter, Betancourt and Hernandez were indicted on one count each of trafficking in cocaine. And during the ensuing trial, the State introduced similar-transaction evidence over appellants' objection. The similar-transaction evidence consisted of testimony from a K9 officer who was involved in the search of a

4

different Massachusetts-registered vehicle driven by appellants in North Carolina. During that incident, Betancourt was driving and the pair were headed southbound on an interstate that feeds into Interstate 85 in a vehicle with unlawfully dark-tinted windows, a single key in the ignition, and religious insignia on the dashboard.

After law enforcement stopped the car, conducted a free-air search and received a positive alert from the K9 for the presence of narcotics, the appellants consented to a search of that vehicle. The car did not contain drugs, but the search resulted in the seizure of $195,000 cash in shrink-wrapped bundles recovered from hidden compartments located on either side of the front bumper.[2] The appellants' claimed to have no knowledge of the presence of this money and disclaimed their ownership to it; consequently, the cash was forfeited. No criminal charges were brought against appellants.

The jury ultimately convicted appellants of the trafficking charges and the trial court denied their respective motions for new trial. These consolidated appeals follow.

---

[2] The K9 officer explained that the dog was capable of detecting both the scent of narcotics themselves and the residual scent left in a location where narcotics had recently been located.

1. We begin by affirming that the evidence set forth *supra*, construed in the light most favorable to the guilty verdict, was sufficient to sustain appellants' convictions on trafficking in cocaine[3] and Betancourt's conviction on obstructing a law-enforcement officer.[4]

2. Appellants both argue that the trial court erred in denying their motions to suppress the drug evidence because the search was unlawful, albeit for different reasons. We will address each of their arguments in turn.

When reviewing the trial court's denial of a motion to suppress, "the evidence is construed most favorably to uphold the court's findings and judgment."[5] And if there is any evidence to support the trial court's findings on disputed facts and credibility, "they will not be disturbed unless clearly erroneous."[6] We consider both

---

[3] *See* OCGA § 16-13-31 (a) (1) ("Any person who knowingly . . . brings into this state or who is knowingly in possession of 28 grams or more of cocaine or of any mixture with a purity of 10 percent or more of cocaine . . . commits the felony offense of trafficking in cocaine . . .").

[4] *See* OCGA § 16-10-24 (a) ("[A] person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor.").

[5] *Davis v. State*, 304 Ga. App. 355, 356 (1) (696 SE2d 381) (2010) (punctuation omitted).

[6] *Id*. (punctuation omitted).

the trial testimony and the testimony from the motion-to-suppress hearing when reviewing the trial court's ruling.[7] With these guiding principles in mind, we turn now to appellants' respective enumerations of error.

(a) Betancourt does not challenge the legality of the traffic stop but argues instead that the stop and his detention were impermissibly prolonged when the officer's initial investigation into the traffic violations evolved into a drug investigation. We disagree.

The Fourth Amendment's protection of a person's right to be secure against unreasonable searches and seizures extends to the investigatory stop of a vehicle, which "cannot be unreasonably prolonged beyond the time required to fulfill the purpose of the stop."[8] A reasonable stop, however, generally includes "the time necessary to verify the driver's license, insurance, registration[;] . . . to complete any paperwork connected with the citation or a written warning[;] [and] . . . to run a computer check to determine whether there are any outstanding arrest warrants for

---

[7] *See id.*

[8] *Sommese v. State*, 299 Ga. App. 664, 668 (1) (683 SE2d 642) (2009); *see Salmeron v. State*, 280 Ga. 735, 736 (1) (632 SE2d 645) (2006).

the driver or the passengers."[9] And while performing these tasks, the officer may question the occupants and request consent to conduct a search of the vehicle, so long as the officer's questioning does not impermissibly prolong the otherwise lawful detention.[10] Thus, no constitutional violation occurs so long as "the purpose for the detention is legitimate, the duration of the detention remains reasonable, and the investigation remains diligent throughout."[11]

And here, it is undisputed that the officer was still in the process of conducting the traffic investigation when appellants consented to the search of the vehicle. Specifically, the officer had not yet received the computer information confirming appellants' identities and the status of Betancourt's license—which he was actively

---

[9] *Sommese*, 299 Ga. App. at 669 (1) (b) (punctuation omitted); *see Salmeron*, 280 Ga. at 737 (1) ("It does not unreasonably expand the scope or duration of a valid traffic stop for an officer to prolong the stop to immediately investigate and determine if the driver is entitled to continue to operate the vehicle by checking the status of the driver's license, insurance, and vehicle registration." (punctuation omitted)); *Giles v. State*, 284 Ga. App. 1, 4 n.1 (1) (642 SE2d 921) (2007).

[10] *See Salmeron*, 280 Ga. at 736 (1) ("[T]he dispositive factor . . . is not the nature or subject of the officer's questioning, but whether that questioning took place during [an] otherwise lawful detention for committing the traffic violations in the officer's presence[;] [i]f a driver is questioned and gives consent while he is being lawfully detained during a traffic stop, there is no Fourth Amendment violation.").

[11] *Williams v. State*, 233 Ga. App. 70, 72 (1) (503 SE2d 324) (1998).

8

pursuing, and which he needed in order to issue the traffic citations. And although a delay in the computer response time would not justify appellants' detention indefinitely, their consent to search the vehicle was obtained approximately 20 minutes after the initial stop, upon the arrival of the translating officer. Under these circumstances, we agree with the trial court that the detention was not unreasonably prolonged beyond the time required to fulfill the purpose of the traffic stop.[12]

(b) Hernandez contends that the scope of the officer's search exceeded the scope of appellants' consent to search the vehicle. In support of this argument, he relies on his voluntary offer to allow the officer to "check" the vehicle and asserts that his statement did not authorize a complete search. But after Hernandez made the voluntary offer and Betancourt gave his contingent consent to search, the officer

---

[12] *See Arroyo v. State*, 309 Ga. App. 494, 496-97 (3) (711 SE2d 60) (2011) (questioning did not extend duration of driver's detention when consent to search was requested and given during the time the officer was issuing traffic citations); *State v. Williams*, 264 Ga. App. 199, 203-04 (590 SE2d 151) (2003) (26-minute delay while officer attempted to determine whether driver had an outstanding warrant did not unreasonably prolong stop); *Williams*, 233 Ga. App. at 71-72 (1) (35-minute delay while officer conducted a computer check for outstanding warrants on driver was reasonable); *see also Hall v. State*, 306 Ga. App. 484, 486 (2) (702 SE2d 483) (2010). *Compare Nunnally v. State*, 310 Ga. App. 183, 186-87 (2) (713 SE2d 408) (2011) (detention impermissibly prolonged when officer abandoned investigation into traffic infraction to focus solely on his efforts to wait for a K9 unit); *State v. Long*, 301 Ga. 839, 841 (689 SE2d 369) (2010) (prolonged detention unreasonable when officer detained occupants for 20 minutes after he fulfilled the purpose of the initial stop).

returned to Hernandez and specifically asked if the vehicle contained "guns or anything illegal," including "drugs or currency or anything of that nature." Hernandez denied the presence of the aforementioned items and consented to a search of the vehicle. Thus, Hernandez gave consent to "search" the vehicle, and his consent, which was not limited in scope, was given in direct response to the officer's query as to the presence of illegal drugs.[13] Moreover, at no time did either appellant object to the scope of the search or withdraw his consent as the search proceeded.[14] Accordingly, the trial court did not err in denying Hernandez's motion to suppress on this basis.

---

[13] *See Caster v. State*, 210 Ga. App. 809, 810 (3) (437 SE2d 608) (1993) (consent to search vehicle after denying the presence of drugs extended to the removal of the loose rear-passenger seat); *Barnwell v. State*, 197 Ga. App. 116, 117 (2) (397 SE2d 717) (1990) (consent to search vehicle extended to the window well and door panel). *Compare Amato v. State*, 193 Ga. App. 459, 460 (1) (388 SE2d 54) (1989) (driver's consent to allow officer, who had "no idea" what he was searching for, to "look inside" vehicle did not extend to the removal of the vent cover).

[14] Contrary to Hernandez's assertion, the officer testified that Hernandez was standing at the rear of the vehicle at the time he was searching under the backseat and therefore could have objected or withdrawn his consent. *See Caster*, 210 Ga. App. at 810 (3); *Barnwell*, 197 Ga. App. at 117 (2). It was only after the officer discovered what he believed to be a hidden compartment that he moved Hernandez to the back of the patrol car.

3. Appellants contend that the trial court erred by admitting similar-transaction evidence relating to the North Carolina traffic stop and seizure of the currency. The State gave notice of its intent to use the evidence to prove plan, scheme, bent of mind, and course of conduct.[15] And prior to its admission, the trial court conducted a hearing in accordance with Uniform Superior Court Rule 31.3 (B), after which it admitted the evidence.

We review the trial court's decision to admit similar-transaction evidence under an "abuse of discretion standard and review the court's factual findings as to the similarity of the incidents under a clearly erroneous standard."[16] As before, appellants each assert error on different grounds, which we will address in turn.

---

[15] We note that for trials conducted after January 1, 2013, the new evidence code permits the admission of similar-transaction evidence for the purpose of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," but no longer for the purpose of proving "course of conduct" or "bent of mind." OCGA § 24-4-404 (b). *See generally Harvey v. State*, __ Ga. App. __, ___*2 (2) (Case No. S13A0598, decided April 15, 2013); *see also* RONALD L. CARLSON & MICHAEL SCOTT CARLSON, CARLSON ON EVIDENCE 55 (2013–2014 ed.) ("In terms of OCGA 24-4-404 (b), the primary change from prior Georgia law relates to the non-incorporation of 'bent of mind' and 'course of conduct' as specific categories and identifies federal rule topics like preparation, plan and additional related grounds as reasons for admitting 'other crimes' evidence . . . .").

[16] *See McNaughton v. State*, 290 Ga. 894, 895 (2 ) (725 SE2d 590) (2012).

(a) Betancourt argues that the trial court's ruling was erroneous because the North Carolina incident was not sufficiently similar to the present crime to warrant its admission. We disagree.

Before similar-transaction evidence may be introduced, the State must make the following three affirmative showings: (1) the evidence is being offered for a proper purpose; (2) the evidence is sufficient to establish that the defendant committed the independent offense or act; and (3) "there is a sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter."[17] And when analyzing whether the prior act is sufficiently similar to the crime charged, "[t]he proper focus is on the similarity, not the differences, between the separate [act] and the crime in question."[18]

In both of the incidents at issue, appellants were traveling together on interstates in southern states, and were driving in vehicles (1) registered in Massachusetts, (2) with dark-tinted windows, (3) with a single key in the ignition, (4) containing religious insignia throughout, and (5) containing special compartments

---

[17] *See Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991).

[18] *Wayne v. State*, 269 Ga. 36, 39 (3) (495 SE2d 34) (1998); *see Garcia v. State*, __ Ga. App. __ (3) (738 SE2d 333) (2013).

hiding shrink-wrapped items. Moreover, the North Carolina traffic stop occurred as appellants were heading southbound on an interstate merging into Interstate 85—a major drug thoroughfare—with a sum of hidden cash (nearly $200,000) large enough to purchase a significant quantity of narcotics. And during the stop at issue, appellants were headed northbound on Interstate 85 with a significant quantity of hidden narcotics valued at approximately $125,000. And since one of the main issues presented in the case *sub judice* is whether appellants knew that the drugs were hidden in their vehicle, we have little trouble concluding that the North Carolina incident was sufficiently similar to the current crime such "that proof of the former tends to prove the latter," and the trial court's ruling in that regard is not clearly erroneous.[19] Finally, we flatly reject Betancourt's contention that the State's failure to prove that the North Carolina K9 alerted specifically to the recent presence of

---

[19] *Williams*, 261 Ga. at 642 (2) (b); *see Crenshaw v. State*, 248 Ga. App. 505, 509 (3) (546 SE2d 890) (2001) ("[T]he issue of admissibility of extrinsic transactions has never been one of mere similarity. It is, rather, relevance to the issues in the trial of the case."); *see also Jones v. State*, 253 Ga. App. 376, 378 (2) (559 SE2d 119) (2002) (holding that evidence of appellant's prior guilty plea to possession of marijuana with the intent to distribute was relevant and admissible in a later case for the same crime when he claimed not to know about the marijuana found in his house).

13

cocaine, as opposed to some other kind of narcotic, rendered it impossible to prove the requisite degree of similarity.[20]

(b) Hernandez asserts that the similar-transaction evidence was inadmissible because the State failed to prove that the forfeited money in the North Carolina traffic stop was the product of a lawful search and seizure. During the trial, the State presented testimony from the North Carolina K9 officer who had searched appellants' vehicle and discovered the hidden compartments, but was unable to call the officer who had initiated the stop because he was on vacation on the date of trial. And because the State was unable to prove the reasons for the stop and that it was lawful, Hernandez contends that evidence of the resulting seizure in that case should have been excluded.[21]

Assuming *arguendo* that appellants have not already waived their opportunity to contest the stop of their vehicle by disclaiming and forfeiting the seized money, we

---

[20] *See Branch v. State*, 255 Ga. App. 596, 598 (565 SE2d 910) (2002) (holding that "there is no requirement that the drug allegedly being distributed or possessed in the indicted offense be the same drug distributed or possessed in the similar transaction").

[21] We note that no evidence was presented calling into question the legality of the stop.

nevertheless conclude that the purposes of the exclusionary rule would not be furthered by applying it to the facts in the present case.

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[22] But this amendment "says nothing about suppressing evidence obtained in violation of [same]."[23] Indeed, as the Supreme Court of Georgia recently explained, while "[t]he exclusionary rule is a judicially created remedy adopted to protect Fourth Amendment rights by deterring illegal searches and seizures,"[24] it is not intended to "cure the invasion of the defendant's rights which he has already suffered, and it does not proscribe the introduction of illegally seized evidence in all proceedings or against all persons."[25] Rather, the rule applies only when "its remedial objectives are thought most efficaciously served."[26]

---

[22] U.S. Const., amend. IV.

[23] *Davis v. United States*, __ U.S. __ (131 SCt 2419, 180 LEd2d 285) (2011).

[24] *State v. Thackston*, 289 Ga. 412, 413 (1) (716 SE2d 517) (2011).

[25] *Id*. (citation and punctuation omitted).

[26] *Id*. (punctuation omitted); *see also Davis*, 131 SCt at 2426-27 ("Where suppression fails to yield appreciable deterrence, exclusion is clearly unwarranted.") (citation and punctuation omitted).

15

In this respect, the Supreme Court of the United States has recently stressed that

> [r]eal deterrent value is a necessary condition for exclusion, but it is not a sufficient one. The analysis must also account for the substantial social costs generated by the rule. Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a last resort. For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.[27]

Consistent with this directive, the Supreme Court of Georgia has instructed that when evaluating whether the exclusionary rule should apply, we are to "weigh the likelihood of deterrence against the costs of withholding information in the truth-seeking process."[28] And in the context of similar transactions, evidence of prior acts or offenses committed by a defendant is generally "irrelevant and inadmissible

---

[27] *Davis*, 131 SCt at 2427.

[28] *Thackston*, 289 Ga. at 413 (1).

in a trial for a different crime."[29] But such evidence is admissible when it demonstrates

> a system of mutually dependent crimes; or is evidence of guilty knowledge; or may bear upon the question of the identity of the accused, or articles connected with the offense; or is evidence of prior attempts by the accused to commit the same crime upon the victim of the offense for which he stands charged; or where it tends to prove malice, intent, motive, or the like, if such an element enters into the offense charged.[30]

The benefit of and, conversely, the potential cost of withholding, similar-transaction evidence is evident in a case such as this, in which appellants' defense is one of unwavering ignorance as to the presence of the hidden compartment and the narcotics contained therein. Suffice it to say, this excuse is much harder to believe twice.

Moreover, it is unlikely that the application of the exclusionary rule here would deter illegal searches and seizures in *Georgia* to any appreciable degree. Indeed, the notion of there being any meaningful deterrent effect from applying the exclusionary rule in a *Georgia* criminal proceeding as a result of evidence unlawfully obtained by law enforcement in a *foreign* jurisdiction is fanciful at best. To be sure, every law-

---

[29] *Pareja v. State*, 286 Ga. 117, 119 (686 SE2d 232) (2009).

[30] *Williams*, 261 Ga. at 642, n.2 (2) (b).

enforcement officer in Georgia is armed with the knowledge that the manner in which he or she conducts a search will "affect the prosecution's ability to secure a conviction in a criminal trial," and this knowledge significantly deters the use of unlawful searches and seizures in our state.[31] But there is no reason to assume that applying the exclusionary rule to evidence stemming from the unlawful acts of a law-enforcement officer from a foreign state will do anything to advance the rule's remedial objectives here in Georgia.[32] Thus, because the rule's deterrence benefits are so clearly outweighed by the costs of withholding the similar-transaction evidence from the truth-seeking process, the trial court did not err in admitting the subject evidence in this case.

---

[31] *Thackston*, 289 Ga. at 415 (1).

[32] *Cf. id*. at 415-16 (1) (applying the balancing test to hold that the exclusionary rule does not apply to probation revocation hearings); *see also Pennsylvania Bd. of Probation & Parole v. Scott*, 524 U.S. 357, 363-69 (II) (118 SCt 2014, 141 LEd2d 344) (1998) (exclusionary rule does not apply to parole revocation hearings); *I. N. S. v. Lopez-Mendoza*, 468 U.S. 1032, 1040-50 (IV) (104 SCt 3479, 82 LEd2d 778) (1984) (exclusionary rule not applicable in civil deportation proceedings); *United States v. Janis*, 428 U.S. 433, 447-60 (IV) (96 SCt 3021, 49 LEd2d 1046) (1976) (no exclusionary rule in civil tax proceedings); *United States v. Calandra*, 414 U.S. 338, 349-52 (IV) (94 SCt 613, 38 LEd2d 561) (1974) (exclusionary rule does not apply in grand-jury proceedings).

4. Finally, appellants argue that their respective trial counsel rendered ineffective assistance. In order to establish this claim, each appellant must prove both that his trial counsel's performance was deficient and that this deficiency prejudiced his defense such that a reasonable probability exists that the outcome at trial would have been different.[33] In the absence of both showings, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable."[34] And there is a strong presumption that trial counsel's performance "falls within the wide range of reasonable professional assistance and that any challenged action might be considered sound trial strategy."[35] Thus, we will affirm the trial court's ruling that appellants were not denied effective assistance of counsel unless that determination is clearly erroneous.[36]

(a) Betancourt argues that his trial counsel was ineffective in several respects. We disagree.

---

[33] *See Smith v. State*, 304 Ga. App. 846, 847 (698 SE2d 355) (2010); *see also Strickland v. Washington*, 466 U.S., 668, 687 (III) (104 SCt 2052, 80 LEd2d 674) (1984).

[34] *Smith*, 304 Ga. App. at 847 (punctuation omitted).

[35] *Id*. (punctuation omitted).

[36] *Id*.

(i) Betancourt first contends that his trial counsel neglected "to engage meaningfully and reasonably in the adversarial process" by failing to adequately investigate the case, communicate with him pretrial, and prepare for trial.[37] But during the hearing on the motion for new trial, Betancourt's trial counsel testified that he visited with Betancourt twice in jail and met with him on three separate occasions at various pretrial hearings. Additionally, Betancourt's trial counsel reviewed discovery, interviewed witnesses, litigated a motion to suppress, and argued against the admission of the similar-transaction evidence.

And while it is certainly true that, as a result of the language barrier, trial counsel needed an interpreter to communicate with Betancourt and did not provide him with a copy of the State's discovery , this in no way prevented counsel from (1) explaining to Betancourt the allegations and evidence against him, (2) making sure

---

[37] Betancourt also raises in a separate enumeration that the trial court erroneously failed to adequately address his concerns regarding his appointed counsel in a pretrial hearing that the court conducted for that purpose. We need not consider that allegation of error separately, however, because Betancourt's post-trial counsel raised the issue on motion for new trial, and the post-trial hearing cured any alleged error by the trial court in the pretrial hearing. *See Ware v. State*, 307 Ga. App. 782, 787-88 (2) (b) (706 SE2d 143) (2011) ("[A] trial court's error in refusing to conduct a hearing [on a defendant's motion for appointment of new counsel] can be cured by a post-trial hearing before the judge in the trial court." (punctuation omitted)).

that Betancourt understood the maximum sentence he was facing, or (3) discussing with him his defense—namely, that he was unaware of the drugs.

Although Betancourt clearly desired more time and attention from his trial counsel, "[t]here is no magic amount of time which a counsel must spend in preparation for trial in order to provide a client with adequate counsel."[38] And Betancourt has failed to point to any evidence or defenses that could have been presented had his counsel devoted more time to him and/or in the preparation of his case. Rather, Betancourt's trial counsel is an experienced criminal defense attorney who was familiar with the applicable law, was not surprised by any of the evidence presented during the trial, and stood prepared to present Betancourt's straight-forward defense. Under these circumstances, Betancourt has failed to show that his trial counsel's performance was deficient or that his defense was prejudiced as a result of his counsel's conduct.[39]

---

[38] *Daniels v. State*, 296 Ga. App. 795, 779 (5) (a) (676 SE2d 13) (2009) (punctuation omitted); *King v. State*, 287 Ga. App. 375, 378 (2) (b) (651 SE2d 496) (2007) ("The complaint of insufficient meetings with trial counsel is not dispositive, as there exists no magic amount of time which counsel must spend in actual conference with his client." (punctuation omitted)).

[39] *See Daniels*, 296 Ga. App. at 779-80 (5) (a); *King*, 287 Ga. App. at 378 (2) (b).

(ii) Betancourt further argues that his counsel was deficient in failing to reassert his previously made objections to the admission of both the drug evidence and the similar-transaction evidence at the time those items were tendered at trial. We need not address the merits of these arguments, however, because as set forth in Divisions 2 and 3, *supra*, the challenged evidence was properly admitted, and any additional objections to its admission would have been futile.[40]

(b) Hernandez claims that his trial counsel was ineffective in that he failed to file a written motion to suppress the similar-transaction evidence prior to trial, instead relying solely on his argument in opposition to its admission during the Uniform Superior Court Rule 31.3 (B) hearing. We first note that Hernandez admittedly cites no authority mandating that his trial counsel file a written pretrial motion. But regardless, as set forth in Divisions 3 and 4 (a) (ii), *supra*, any pretrial motion as to the similar-transaction evidence would have been futile, and counsel was not deficient for failing to make a futile motion.[41]

---

[40] *See Ventura v. State*, 284 Ga. 215, 218 (4) (663 SE2d 149) (2008) ("The failure to pursue a futile objection does not amount to ineffective assistance." (punctuation omitted)).

[41] *See id.*

22

For all of the foregoing reasons, we affirm appellants' convictions in both cases.

*Judgment affirmed in Case No. A13A0289; judgment affirmed in Case No. A13A0290. Andrews, P. J., and McMillian, J., concur.*