309 Ga. 28
FINAL COPY

S20A0857. DIXON v. THE STATE.

ELLINGTON, Justice.

Stanley Dixon shot a handgun at Cedric Clark and Warren Boyd, killing Clark. A jury found Dixon guilty of malice murder, aggravated assault, possession of a handgun by an underaged person, and multiple counts of participating in criminal gang activity.[1] On appeal, Dixon contends that the evidence was

_____

[1] The shooting occurred on November 1, 2016. A Clayton County grand jury returned an indictment on January 31, 2018, charging Dixon and Demarco Reid with malice murder (Count 1), felony murder predicated on the aggravated assaults against Clark and Boyd (Counts 2 and 3), aggravated assault against Clark (Count 4), aggravated assault against Boyd (Count 5), violations of Georgia's Street Gang Terrorism and Prevention Act (Counts 6 through 17), and possession of a handgun by a person under the age of 18 years (Count 18). The indictment also charged Dixon and Markee Brown with threatening a witness in a proceeding (Count 19) and participating in criminal gang activity (Counts 20 and 21) in connection with an alleged attempt in late 2017 to dissuade co-defendant Reid from testifying against Dixon. Following a jury trial against Dixon alone that ended on November 9, 2018, Dixon was found guilty on Counts 1 through 5, 6, 8, 10, 12, 14, and 16. The jury found Dixon not guilty of six of the November 2016 criminal gang activity violations (Counts 7, 9, 11, 13, 15, and 17) and not guilty on all of the 2017 counts (Counts 19 through 21). By judgment entered on November 9, 2018, and amended on February 11, 2019, and October 8, 2019, the trial court sentenced Dixon to life imprisonment for malice murder (Count 1), 20 years to serve for the

insufficient as to all counts of participating in criminal gang activity and that the trial court erred in denying his motion for a new trial. In addition, he contends that the trial court erred in instructing the jury on the offense of participating in criminal gang activity and that he received ineffective assistance of counsel. For the reasons explained below, we affirm.

Viewed in the light most favorable to the verdicts, the evidence showed the following. Boyd testified as follows. On November 1, 2016, he was one of approximately ten boys who were playing basketball in the gym at Charles Drew High School in Clayton County. Boyd, who associated with members of the Gangster Disciples gang, and Dixon, who was part of a "little crew" called

aggravated assault against Boyd (Count 5), 20 years to serve each for two counts of participating in criminal gang activity (Counts 6 and 14) concurrently with each other and consecutively to Count 1, 10 years to serve followed by 10 years' probation on another count of participating in criminal gang activity (Count 16) to run consecutively to Count 6, and 12 months to serve for possession of a handgun by a person under the age of 18 years (Count 18) to run concurrently with Count 16. Counts 2, 3, 4, 8, 10, and 12 either were vacated as a matter of law or merged. Dixon filed a timely motion for new trial, which he amended on August 6, 2019. After a hearing on October 24, 2019, the trial court denied Dixon's motion for a new trial on October 30, 2019. Dixon filed a timely notice of appeal, and his appeal was docketed in this Court to the April 2020 term and submitted for decision on the briefs.

"Slime," began "play fighting." Dixon took offense when Boyd touched and commented derisively on the "YSL" logo necklace that Dixon was wearing, which Boyd described as a "Slime chain." Dixon told Boyd not to touch his chain, and Boyd replied, "f*ck your chain." Dixon told Boyd to "stop playing with [him] about [his] chain and Slime," and then choked Boyd. Boyd then forcefully slapped Dixon's face as other students looked on. Another student broke up the fight. After school was dismissed, Dixon sent word to Boyd that he wanted to fight after school to "squash the beef," and Boyd agreed.

On his way to Dixon's neighborhood that evening, Boyd saw his close friend, Clark, and told him he was going to fight. Clark volunteered to go with Boyd to protect his friend from being "jumped," because that was "how [Dixon's] group [got] down." After Boyd and Clark reached Dixon's neighborhood, Boyd texted Dixon that he had arrived. When Boyd and Clark were a few houses away from Dixon's house, Dixon stepped out into the street toward them, holding a handgun. He cocked the gun and fired two shots in their direction. Boyd and Clark scattered as Dixon chased them. Boyd

made it back to Clark's home unharmed; Clark died in a neighboring yard of a gunshot wound that pierced his thoracic aorta.

The State presented the testimony of lay and expert witnesses showing that the shooting was gang-related. Dixon's cousin and roommate, Demarco Reid, testified that it was his gun that Dixon used to shoot at Boyd and Clark.[2] Reid testified that he was in a group called "Slime," although he denied knowing whether Dixon was a member of Slime. Reid also admitted that Slime was "bigger" than just students at Drew High School. Another Drew High School student testified that he was in Slime, along with Dixon and Reid, although he described Slime as "just a clique" of "less than ten . . . guys [who] would hang out together." That student testified that Slime members participated in group text messaging chats.

Markee Brown testified that he met Dixon in jail while both were awaiting trial. Dixon told Brown that he was innocent and that his cousin, Reid, was "telling on him." Dixon asked Brown to "get"

---

[2] Reid was indicted along with Dixon. The record shows that, before he testified against Dixon, Reid agreed to plead guilty to one count of participating in criminal gang activity, with the sentence to be determined later.

Reid and to have Reid sign an affidavit that would free Dixon. Thereafter, Brown was transferred to another housing unit of the jail, where Reid was also housed. The following week, Brown beat up Reid. Later, Brown arranged for letters to be passed to Dixon. In one letter, Brown explained to Dixon what he had done, saying that he "ate that rat b**ch"; Brown testified that this meant that, "on [Dixon's] behalf," he beat up Reid.[3] In another letter, Brown told Dixon, "I'll do anything to prove my loyalty." Brown admitted associating with members of the Bloods, including while in jail, although he denied being a gang member. Before Dixon's trial, Brown pleaded guilty to threatening a witness in connection with beating Reid and to participating in criminal gang activity predicated on that offense.

At trial, a Clayton County police department lieutenant was qualified as an expert in gang investigations. The expert, who had interviewed numerous gang members, particularly members of the

---

[3] At trial, Brown contradicted himself to some extent, testifying also that he beat up Reid on his own initiative and for his own reasons.

Bloods and the Gangster Disciples, testified as follows. At the relevant time, there was a large gang presence at Drew High School. The East Coast Bloods criminal street gang had a large presence in Clayton County. Members of the Bloods used certain hand signs and took distinctive stances in photographs. The Bloods commonly wore the color red, and to a lesser extent yellow and green, to signal their affiliation, sometimes wearing bandanas, called "flags," of those colors. Some Bloods subgroups or "sets" used the term "Slime" to identify themselves because they consider blood to be slimy, and the expert had never seen any gang other than the Bloods use the term. The acronym "YSL" stands for "Young Slime Life." Slime members often used the color green, instead of red, and used a gang sign where the member places his index finger underneath his nose as if wiping the nose. Members of Slime often employed a snake graphic symbol when texting and using social media.

The expert reviewed numerous photographs and screen shots taken from Reid's cell phone that depicted Dixon and others. The expert pointed out details in the photos that signified that Dixon was

affiliated with the Bloods: Dixon wearing a green bandana; wearing "YSL" clothing items; making Slime hand signs, including in group photographs with other individuals who were flashing common Bloods hand signs; and using the snake symbol in messages.

The expert also testified that one of the common ways to become a Bloods member was by a "beat-in" where the joining member has to fight three other Bloods for 31 seconds. Bloods called this type of gang initiation a "trey one." The expert testified that these "beat-ins" have taken place in schools, often in bathrooms. The expert reviewed videos recovered from Reid's cell phone. Some of the videos depicted three or four young males, including Dixon and Reid, fighting a single male inside a public bathroom while others watched. Someone off camera can be heard directing the fighters when to begin and when to stop fighting. Fights were stopped when the single fighter fell to the ground or moved out of reach of the group. Some of the fights were deemed not to count because they are "not 31" or "only 12 seconds." In one video, someone asked if that was "trey one" after the group stopped beating the single fighter. At

the end, Reid began a handshake with the single fighter. The expert testified that the videos were consistent with "beat-in" initiations.

The expert reviewed a series of group text messages recovered from Reid's cell phone. On October 12, 2016, Dixon messaged the group that certain people were not Slime because they had not paid their dues yet. When questioned about this text message, the expert testified that most gangs require members to pay monetary dues. Also on October 12, 2016, Dixon messaged, "All Slimes meet me on the culinary arts hall right now" and "[we've] got to walk deep because [they're] going to try something." Several others responded on the group chat as they planned to congregate. The expert testified that Dixon's messages were consistent with a gang member soliciting fellow gang members to assemble in a large group to intimidate their rivals. On October 13, 2016, Dixon messaged to the group that they were about to "eat" someone who "said f slime." The expert testified that Bloods call fighting "eating" and that Dixon's message was consistent with a gang associate's response to his gang being disrespected.

The expert further testified to the following. In addition to the presence of the Bloods in Clayton County, there was a large presence of a rival gang, the Gangster Disciples. Many gang-related shootings have been in retaliation for rival gang members having disrespected the aggressors' gang. A Gangster Disciple member slapping a Bloods member in front of a crowded gym or a Gangster Disciple breaking a Blood's YSL necklace would be interpreted as a sign of disrespect. Gang associates often would threaten others with violence to keep them from testifying, and beating up a "snitch" for another gang associate could show loyalty to the gang. Finally, the expert testified that loyalty between gang members was "paramount" and their "number one responsibility."

1. (a) Dixon does not challenge the sufficiency of the evidence presented at his trial as to malice murder (Count 1), aggravated assault (Count 5), and possession of a handgun by an underaged person (Count 18). Nevertheless, as is our customary practice in murder cases, we have independently reviewed the record and conclude that the evidence was legally sufficient to authorize a

rational trier of fact to find beyond a reasonable doubt that Dixon was guilty of these crimes. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

(b) Dixon contends that the evidence was insufficient to find him guilty of participating in criminal gang activity. In Counts 6, 14, and 16, the indictment charged Dixon with participating in criminal gang activity "through the commission of" the offenses of malice murder, aggravated assault, and possession of a handgun by an underaged person.[4]

The Georgia Street Gang Terrorism and Prevention Act (the "Gang Act") appears at OCGA §§ 16-15-1 through 16-15-11. OCGA §

---

[4] Whether the trial court erred in denying Dixon's motion for a directed verdict with regard to Counts 8, 10, and 12 is moot because these counts either were vacated by operation of law or merged for sentencing. *Rosser v. State*, __ Ga. __, __ (842 SE2d 821) (2020). Whether the trial court erred in denying Dixon's motion for a directed verdict with regard to Counts 7, 9, 11, 13, 15, and 17, which alleged participating in criminal gang activity in violation of OCGA § 16-15-4 (b), through the commission of the specified felony offenses "with the intent to increase his status" in the Bloods, is moot because the jury found him not guilty of those charges. And whether the trial court erred in denying Dixon's motion for a directed verdict with regard to Count 19, threatening a witness, and Counts 20 and 21, gang-activity offenses predicated on Count 19, is likewise moot because the jury found him not guilty of those charges. See *Lupoe v. State*, 284 Ga. 576, 577 n.2 (669 SE2d 133) (2008); *Matthews v. State*, 268 Ga. 798, 803 (5) (493 SE2d 136) (1997).

16-15-4 (a) provides that "[i]t shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3." OCGA § 16-15-3 (1) (J) provides that criminal gang activity means, inter alia, "the commission [or] attempted commission [of] . . . [a]ny criminal offense in the State of Georgia . . . that involves violence, possession of a weapon, or use of a weapon[.]" The State was required to prove four elements to establish that Dixon violated OCGA § 16-15-4 (a) as alleged in the indictment:

> (1) the existence of a "criminal street gang," defined in OCGA § 16-15-3 (2) as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"; (2) the defendant's association with the gang; (3) that the defendant committed one of the offenses identified in OCGA § 16-15-3 (1); and (4) that the crime was intended to further the interests of the gang.

*Boyd v. State*, 306 Ga. 204, 209 (1) (b) (830 SE2d 160) (2019) (citations and punctuation omitted). "[T]here must be some nexus between the act and an intent to further street gang activity."

*Rodriguez v. State*, 284 Ga. 803, 807 (1) (671 SE2d 497) (2009) (punctuation omitted).[5] Dixon contends that there was no evidence that Slime was a criminal gang as defined by the Act or that any members of Slime engaged in criminal gang activity. In addition, he contends that the State failed to prove that he was associated with Slime, or any other gang, and failed to prove that there was a nexus between his commission of murder, aggravated assault, and illegal possession of a weapon and any intent to further the interests of any gang. We disagree.

The expert's testimony, summarized above, authorized the jury to find that the Bloods was a criminal street gang engaged in criminal gang activity in Georgia as defined in the Gang Act. The evidence authorized the jury to find that Dixon was associated with Slime, which was a nickname for a set of the Bloods gang, and that he participated in criminal gang activity with other associates and

---

[5] See also *Stripling v. State*, 304 Ga. 131, 134 (1) (b) (816 SE2d 663) (2018) ("Proof that the commission of the predicate act was intended to further the interests of the gang is essential to prove a violation of OCGA § 16-15-4 (a)." (citations and punctuation omitted)).

members of Slime, such as initiating new members through "trey one" beatings. And the evidence authorized the jury to find that Dixon possessed a firearm and committed the violent felonies of murder and aggravated assault and that he did so in order to retaliate for Boyd's verbal and physical conduct that Dixon viewed as disrespectful of Dixon's gang, Slime. Thus, the State's evidence was sufficient to establish a nexus between the predicate acts and an intent to further the interests of the gang.

Based on this evidence, the jury was authorized to find Dixon guilty of the violations of OCGA § 16-15-4 (a) charged in Counts 6, 14, and 16. See *Jackson v. State*, 306 Ga. 706, 709-710 (1) (832 SE2d 809) (2019) (Evidence showing that the defendant shot and killed a rival gang member in retaliation for the victim's having shot at a member of the defendant's gang authorized the jury to find a violation of OCGA § 16-15-4 (a).); *Parks v. State*, 304 Ga. 313, 316-319 (1) (b) (818 SE2d 502) (2018) (Evidence that the defendant and other gang members drove through a neighborhood shouting the gang's name and got out of their cars "trying to fight" the residents

authorized the jury to find a violation of OCGA § 16-15-4 (a).); *In the Interest of W. B.*, 342 Ga. App. 277, 282 (801 SE2d 595) (2017) ("Evidence showing that a crime was done in retaliation for some act or insult committed against the gang or its members will also serve to show that the crime furthered the gang's interests." (citations omitted)).

2. Dixon contends that the trial court erred in instructing the jury on violations of the Gang Act. Specifically, he contends that the instruction given by the trial court failed to limit the scope of the jury's inquiry to the specific predicate criminal acts alleged in the indictment and instead permitted the jury to find him guilty of the Gang Act violation based on evidence that he participated in any of the gang's criminal activities. Dixon also contends that the trial court erred in giving an instruction regarding parties to a crime. Dixon did not object to the charges given, so our review is for plain error. See OCGA § 17-8-58 (b) (Instructional error "may be considered on appeal" despite the defendant's failure to object when the instructional error "constitutes plain error which affects

substantial rights of the parties.").

> To show plain error, [the appellant] must demonstrate that the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings. Satisfying all four prongs of this standard is difficult, as it should be.

*Hood v. State*, 303 Ga. 420, 425-426 (2) (a) (811 SE2d 392) (2018) (citations and punctuation omitted). See *State v. Herrera-Bustamante*, 304 Ga. 259, 264 (2) (b) (818 SE2d 552) (2018) (The Court need not analyze all of the elements of the plain error test when the appellant fails to establish one of them.).

(a) With regard to the criminal gang activity instruction, the record contradicts Dixon's assertion that the instruction failed to limit the scope of the jury's inquiry to the specific predicate criminal acts alleged in the indictment. The trial court gave the pattern jury instruction in full,[6] as Dixon requested. That instruction listed the four elements of the offense, see Division 1 (b), supra, including that

---

[6] See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.02.25 (4th ed., updated January 2020).

"the State must prove that the defendant conducted or participated in the alleged predicate act consisting of the crimes constituting the criminal gang activity . . . that are alleged in each count" and instructed the jury that "the State must prove that there is a nexus, that is a connection, between the crime committed and the gang [and] that the crime was committed to further the interest of the gang[.]" Reading the trial court's charge as a whole, as we are required to do, the trial court's instruction for the offense of participating in criminal gang activity was a correct and complete statement of the law applicable to the charges of participation in criminal gang activity under OCGA § 16-15-4 (a). See OCGA §§ 16-15-3 (1) (J), (3); 16-15-4 (a); 16-15-9; *Jackson*, 306 Ga. at 712 (3) (b); *Boyd*, 306 Ga. at 209 (1) (b); *Rodriguez*, 284 Ga. at 807 (1); see also *Jackson v. State*, 306 Ga. 475, 477 (2) (831 SE2d 755) (2019) ("A jury instruction must be adjusted to the evidence and embody a correct, applicable, and complete statement of law." (citation and punctuation omitted)). Dixon fails to show error, much less plain error. See *Jackson*, 306 Ga. at 712 (3) (b); *Jackson*, 306 Ga. at 477-

478 (2).

(b) With regard to the jury instruction on parties to a crime, Dixon contends that the principle of "party to the crime" is not available for a charge of participating in criminal gang activity under OCGA § 16-15-4 (a).[7] This is incorrect. See *Broxton v. State*, 306 Ga. 127, 137 (4) (829 SE2d 333) (2019) (Evidence authorized the jury to find the defendant guilty as a party to the crime of Gang Act violations predicated on the malice murder of one victim and the aggravated assault of another, where there was evidence that the defendant was in a car with fellow gang members, driving around and looking for rival gang members to shoot, participated in one shooting, continued riding with his fellow gang members to another location, waited in the car while the gang members who actually committed the predicate murder and aggravated assault got out of the car and shot the victims, and then fled the scene with them.).

---

[7] The record shows that the State requested, and the trial court gave, the pattern jury instruction on parties to a crime. See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.42.10 (4th ed., updated January 2020).

Dixon has not argued or shown that the jury instruction was erroneous for any other reason. See OCGA § 16-2-20; *Sharpe v. State*, 272 Ga. 684, 688-689 (6) (531 SE2d 84) (2000) (The pattern jury instruction concerning parties to a crime fully and adequately informs a jury of the correct legal principles.). Consequently, this claim of error fails. See *Jackson*, 306 Ga. at 477-478 (2).

3. Dixon contends that he received ineffective assistance of counsel. Specifically, he contends that his trial counsel's failure to object to the jury instructions on criminal gang activity and parties to a crime, as required in order to preserve errors in the instructions for ordinary appellate review, constituted deficient performance. He also argues that the trial court failed to conduct a proper inquiry into his ineffective assistance of counsel claim and improperly applied a sufficiency of the evidence standard to the claim.

To establish ineffective assistance of counsel, a defendant must show that his trial counsel's performance was professionally deficient and that, but for such deficient performance, there is a reasonable probability that the result of the trial would have been

different. *Strickland v. Washington*, 466 U. S. 668, 695 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984). If Dixon fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *DeLoach v. State*, 308 Ga. __, __ (2) (840 SE2d 396) (2020). "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." *State v. Spratlin*, 305 Ga. 585, 591 (2) (826 SE2d 36) (2019) (citation omitted).

Although the trial court failed to make specific factual findings regarding Dixon's claim of ineffective assistance of counsel, the threshold issue is Dixon's argument that the jury instructions were not correct statements of applicable law, an issue which does not require specific findings of fact. Consequently, Dixon's arguments that the trial court failed to conduct a proper inquiry into his ineffective assistance of counsel claim and improperly applied a sufficiency of the evidence standard to the claim are off point.

As we explained in Division 2, supra, the jury instructions for

participating in criminal gang activity and for parties to a crime were correct and complete statements of applicable law. An objection to either of these instructions would have lacked merit, and "[t]he failure to pursue a futile objection does not amount to ineffective assistance." *Ventura v. State*, 284 Ga. 215, 218 (4) (663 SE2d 149) (2008) (citation omitted). Dixon's claim of ineffective assistance of counsel therefore fails. See *Anglin v. State*, 302 Ga. 333, 342-345 (8) (806 SE2d 573) (2017).

4. Dixon contends that, in ruling on his motion for a new trial on the general grounds,[8] the trial court failed to fulfill its role as the "thirteenth juror."

In the order denying Dixon's motion for a new trial, the trial court noted its broad discretion to sit as a "thirteenth juror" and to weigh the evidence on a motion for new trial alleging the general

---

[8] See OCGA §§ 5-5-20 ("In any case when the verdict of a jury is found contrary to evidence and the principles of justice and equity, the judge presiding may grant a new trial before another jury."); 5-5-21 ("The presiding judge may exercise a sound discretion in granting or refusing new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding.").

grounds and its duty to exercise its discretion and weigh the evidence and consider the credibility of the witnesses. See *Alvelo v. State*, 288 Ga. 437, 438-439 (1) (704 SE2d 787) (2011). "Having performed this duty to sit as a 'thirteenth juror' and having weighed the evidence and considered the credibility of the witnesses," the trial court found that the verdicts were "amply supported by the evidence, not contrary to the evidence, not strongly and decidedly against the weight of the evidence and not contrary to evidence and the principles of justice and equity." Nothing in the record supports Dixon's claim that the trial court failed to exercise its discretion as the thirteenth juror. We have no basis for disturbing the trial court's denial of Dixon's motion for new trial on the general grounds. See *Smith v. State*, 300 Ga. 532, 534 (1) (796 SE2d 671) (2017) (because "the evidence was sufficient to support the verdict," the trial court did not abuse its discretion as the thirteenth juror where, in its order denying the motion for new trial, "the trial court recited it had weighed the evidence, including the credibility of the witnesses, and found [the defendant] was not entitled to a new trial on the general

grounds").

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 1, 2020.
Murder. Clayton Superior Court. Before Judge Benefield, Senior Judge.

*Christina M. Kempter*, for appellant.

*Tasha M. Mosley, District Attorney, Jeffrey M. Hawkins, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.