**FOURTH DIVISION**
**RICKMAN, C. J.,**
**DILLARD, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 5, 2023**

# In the Court of Appeals of Georgia

A23A0263. BAGGETT v. THE STATE.

DILLARD, Presiding Judge.

Following trial, a jury convicted Christopher Baggett on one count of trafficking persons for sexual servitude, one count of criminal attempt to commit child molestation, and one count of possession of a firearm during the commission of a felony. Baggett now appeals his convictions and the denial of his motion for new trial, arguing the trial court erred in denying his claims of ineffective assistance of counsel and in failing to properly instruct the jury as to the trafficking-persons-for-sexual-servitude and criminal-attempt-to-commit-child-molestation charges. For the following reasons, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the record shows that in 2020, Sergeant Misty Pledger worked in a Floyd County Police Department task force that investigated internet crimes against children. And while on assignment (on March 28, 2020), Sergeant Pledger posted an advertisement on a website commonly used to solicit prostitutes, in which she claimed to be a nineteen-year-old female seeking sexual encounters with men. Specifically, in an advertisement titled "Car Play," she listed the sexual acts that she was willing to perform but noted she was not mobile (meaning she did not have a vehicle).

About one day later, Sergeant Pledger received a text message, via the website, from a male—ultimately identified as Baggett—asking if she was available that day and if she could meet in an area not far from Calhoun, where he claimed he lived. Sergeant Pledger—in her undercover capacity—responded that she was not mobile because she did not have a license and that she lived in the Silver Creek area. Baggett replied, asking her age. When Sergeant Pledger answered, "fourteen, but I'm a pro. No worries[,]" Baggett responded by texting a smiley-face emoji, and then asking her for photographs. Not long thereafter, Sergeant Pledger sent him some intentionally

_____

[1] *See, e.g.*, *Libri v. State*, 346 Ga. App. 420, 421 (816 SE2d 417) (2018).

obscured photographs (to conceal her age), and the two continued exchanging messages.

Eventually, Pledger and Baggett made a plan to meet on Monday morning, March 30, 2020, at Midway Park. Sergeant Pledger purposefully chose this location because it was in a rural part of Silver Creek and unlikely to be crowded on that day and time. Baggett stated that he was not familiar with that area, but that he could be there in about 30 minutes. That morning, they texted each other and agreed to meet around 9:30 a.m. And at one point during their exchanges, Baggett asked Pledger if she was a "cop," which she denied. Pledger then told him that she would be near the tennis courts toward the back of the park, and when Baggett asked her name, she replied "Becca."

Prior to the scheduled meeting time, Sergeant Pledger went to Midway Park in an unmarked vehicle and waited near the tennis courts. Additionally, two other officers in marked vehicles parked where they had a good view of the only road leading into the park. And upon arriving, Sergeant Pledger noticed a vehicle already parked near the tennis court, and so she texted Baggett to ask if he had already arrived. Baggett responded that he had not yet arrived and claimed he was driving a white Honda Pilot. Shortly thereafter, he responded to another text from Pledger and

said that he was close. A few minutes after the scheduled meeting time passed, Pledger texted Baggett to ask where he was, but she received no response. Then, Pledger and the other patrol officers observed a red pickup truck enter the park, but rather than head toward the tennis courts, it turned down a road in the park that lead to a public trash dump. Once there, it quickly made a U-turn and headed back toward the park's exit; and as it did so, one of the patrol officers observed that its truck bed was empty.

Suspicious that the person driving the red pickup truck was the person with whom she had been texting, Sergeant Pledger directed the patrol officers to follow the truck and conduct an investigatory stop. And approximately 15 minutes later (because of the traffic on the road heading back toward town), one of the patrol officers caught up to the red pickup truck and activated his vehicle's blue lights. The truck pulled over into the parking lot of a restaurant, at which point the officer approached the vehicle and asked the driver for his license, which identified him as Baggett. The officer—as recorded on his body-camera—informed Baggett that he had been pulled over based on his suspicious behavior in Midway Park, noting that there had been thefts in the area. Baggett initially did not offer an explanation for why he drove to the park, but after a couple of minutes, he acknowledged that he probably had been

4

pulled over for "messing with someone I shouldn't have been messing with" and "messing with someone on a website." The patrol officer then confirmed to Baggett that he was suspected of going to the park to meet an underage girl.

Less than ten minutes after the patrol officer initiated the traffic stop, Sergeant Pledger arrived on the scene, spoke to the patrol officer, and then began speaking to Baggett, who had exited his vehicle. After a brief conversation, Pledger asked Baggett if she could look at his mobile phone. He consented, and Pledger retrieved the phone from his truck. An immediate examination of the phone's contents revealed GPS directions to Midway Park and the text message exchange between Baggett and Pledger from the past few days. Pledger then placed Baggett under arrest, informed him of his rights, and in a subsequent search of his vehicle, officers recovered a handgun registered to Baggett.

Thereafter, the State charged Baggett, via indictment, with one count each of trafficking persons for sexual servitude, criminal attempt to commit child molestation, criminal attempt to commit aggravated child molestation, and possession of a firearm during the commission of a felony. The case proceeded to trial, in which the State presented the aforementioned evidence, and Baggett testified in his own defense, explaining that he did not think the text conversation with Sergeant Pledger posing

5

as a 14-year-old girl was the same conversation in which he agreed to meet and pay for a sexual encounter and that, regardless, he abandoned the encounter when he drove away from the park. Nonetheless, at the trial's conclusion, the jury found Baggett guilty on the charges of trafficking persons for sexual servitude, criminal attempt to commit child molestation, and possession of a firearm during the commission of a felony, but found him not guilty on the charge of criminal attempt to commit aggravated child molestation.

Thereafter, Baggett obtained new counsel and filed a motion for new trial, in which he argued, *inter alia*, that his trial counsel rendered ineffective assistance, particularly in failing to file a motion to suppress evidence recovered as a result of the traffic stop and in failing to object to several jury instructions. After the State filed a response, the trial court held a hearing on the matter, during which Baggett's trial counsel testified as to her representation; and ultimately it denied his motion. This appeal follows.

1. Baggett first contends the trial court erred in denying his claim that his trial counsel rendered ineffective assistance by failing to file a motion to suppress the evidence obtained as a result of what he argues was an unlawful traffic stop that was unreasonably prolonged. We disagree.

6

To evaluate Baggett's claims of ineffective assistance of counsel, we apply the two-pronged test established in *Strickland v. Washington*,[2] which requires him to show that his trial counsel's performance was "deficient and that the deficient performance so prejudiced him that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different."[3] Importantly, should a defendant "fail to meet his burden on one prong of this two-prong test, we need not review the other prong."[4] In addition, there is a strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct, and a criminal defendant must overcome this presumption.[5] In fact, the reasonableness of trial counsel's conduct is "examined from counsel's perspective at

---

[2] 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

[3] *Chapman v. State*, 273 Ga. 348, 349-50 (2) (541 SE2d 634) (2001); *see Strickland*, 466 U.S. at 687 (III); *Ashmid v. State*, 316 Ga. App. 550, 556 (3) (730 SE2d 37) (2012).

[4] *McAllister v. State*, 351 Ga. App. 76, 93 (6) (830 SE2d 443) (2019); *accord Gomez v. State*, 300 Ga. 571, 573 (797 SE2d 478) (2017).

[5] *Chapman*, 273 Ga. at 350 (2); *see Cammer v. Walker*, 290 Ga. 251, 255 (1) (719 SE2d 437) (2011) ("A claim of ineffective assistance of counsel is judged by whether counsel rendered reasonably effective assistance, not by a standard of errorless counsel or by hindsight." (punctuation omitted)).

the time of trial and under the particular circumstances of the case[.]"[6] And decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if "they were so patently unreasonable that no competent attorney would have followed such a course."[7] Moreover, unless clearly erroneous, this Court will "uphold a trial court's factual determinations with respect to claims of ineffective assistance of counsel; however, a trial court's legal conclusions in this regard are reviewed *de novo*."[8] With these guiding principles in mind, we turn now to Baggett's specific claims of error.

(a) *Initial Traffic Stop.* Baggett argues his trial counsel rendered ineffective assistance by failing to file a motion to suppress the evidence obtained as a result of the traffic stop of his vehicle, first asserting that the police officers lacked any justification to make such a stop. He further claims this failure was not based on any

---

[6] *Lockhart v. State*, 298 Ga. 384, 385 (2) (782 SE2d 245) (2016).

[7] *Id.*

[8] *Sowell v. State*, 327 Ga. App. 532, 539 (4) (759 SE2d 602) (2014); *accord Johnson v. State*, 361 Ga. App. 43, 54 (4) (861 SE2d 660) (2021); *see Grant v. State*, 295 Ga. 126, 130 (5) (757 SE2d 831) (2014) (holding that "[i]n reviewing a claim of ineffective assistance, we give deference to the trial court's factual findings and credibility determinations unless clearly erroneous, but we review a trial court's legal conclusions de novo").

strategy, as his trial counsel testified during the hearing on his motion for new trial that it was oversight on her part. But it is well established that "the mere failure to present an argument in a motion to suppress does not constitute per se ineffective assistance of counsel."[9] Rather, the appellant bears the burden of "making a strong showing that, if his counsel had presented the argument, the trial court would have suppressed the evidence."[10]

As to the merits of such a motion, the Supreme Court of the United States has construed the Fourth Amendment to the United States Constitution[11] as setting forth three tiers of police-citizen encounters:[12] "(1) communication between police and

---

[9] *Alvarez-Maldonado v. State*, 359 Ga. App. 500, 509 (2) (859 SE2d 401) (2021) (punctuation omitted); *accord Reyes-Castro v. State*, 352 Ga. App. 48, 56 (1) (a) (833 SE2d 735) (2019).

[10] *Alvarez-Maldonado*, 359 Ga. App. at 509 (2) (punctuation omitted); *accord Reyes-Castro*, 352 Ga. App. at 56 (1) (a).

[11] *See* U.S. CONST. amend IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."). GA. CONST. Art. 1, § 1, ¶ XIII ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause supported by oath or affirmation particularly describing the place or places to be searched and the persons or things to be seized.

[12] *Miller v. State*, 351 Ga. App. 757, 761 (1) (833 SE2d 142) (2019); *see State v. Walker*, 295 Ga. 888, 889 (764 SE2d 804) (2014) (noting that Fourth Amendment

citizens involving no coercion or detention, (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause."[13]

In first-tier encounters, the police may "approach citizens, ask for identification, ask for consent to search, and otherwise freely question the citizen without any basis or belief of criminal activity so long as the police do not detain the citizen or convey the message that the citizen may not leave."[14] In contrast, during a second-tier encounter, even in the absence of probable cause, a police officer "may stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity."[15] Importantly, to do so, the officer must have "more than a subjective, unparticularized

jurisprudence recognizes three tiers of police-citizen encounters).

[13] *Miller*, 351 Ga. App. at 761 (1) (punctuation omitted).

[14] *Id.* (punctuation omitted); *accord Walker*, 295 Ga. at 889.

[15] *Miller*, 351 Ga. App. at 762 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 889-90; *see Lumpkin v. State*, 310 Ga. 139, 151-52 (3) (849 SE2d 175) (2020) (explaining that a traffic stop is a second-tier encounter and if "an officer lacks reasonable suspicion to stop a vehicle, the traffic stop violates the Fourth Amendment, and evidence obtained as a result of the stop must be suppressed.").

suspicion or hunch."[16] Indeed, the officer's action must be "justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[17] Furthermore, the officer must have "some basis from which the court can determine that the detention was neither arbitrary nor harassing."[18] But significantly, a determination that reasonable suspicion exists "need not rule out the possibility of innocent conduct."[19]

Here, the undisputed evidence shows that Sergeant Pledger—posing as a 14-year-old girl on a website known for its use in soliciting prostitutes—exchanged text messages with a person wanting to pay her for a sexual encounter. Pledger then set up a meeting with that suspect at a rural park on a Monday morning at a time when it was less likely to be patronized. That morning, Pledger exchanged texts with the

---

[16] *Miller*, 351 Ga. App. at 762 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 890.

[17] *Miller*, 351 Ga. App. at 762 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 890.

[18] *Miller*, 351 Ga. App. at 762 (1) (punctuation omitted); *accord Walker*, 295 Ga. at 890.

[19] *State v. Walker*, 350 Ga. App. 168, 176 (2) (a) (828 SE2d 402) (2019) (punctuation omitted); *accord State v. Preston*, 348 Ga. App. 662, 664 (824 SE2d 582) (2019).

suspect, in which he confirmed that he was on his way. And shortly after the scheduled time for the meeting, Pledger and the patrol officers observed a pickup truck pull into the trash dump area of the park, despite its truck bed being empty, then quickly U-turn and exit the park. Given these circumstances, the Floyd County officers had a reasonable, articulable suspicion the driver of the pickup truck was the person who wanted to meet and pay for sex with an underage girl; and thus, the patrol officer was authorized to initiate a traffic stop to investigate the situation further.[20]

---

[20] *See Lumpkin*, 310 Ga. at 151-52 (3) (holding that officer's traffic stop of defendants' vehicle was based on reasonable suspicion despite observing no traffic offense in light of fact vehicle generally matched description of a BOLO and vehicle was coming from the direction of the crime scene on the only road from which a vehicle could exit the street where the crime occurred and within minutes of the crime's occurrence); *Hall v. State*, 351 Ga. App. 695, 700-01 (1) (832 SE2d 669) (2019) (finding that even independent of any traffic offense, officer had reasonable suspicion to justify traffic stop given that another officer relayed information that he suspected defendant had just engaged in a drug transaction in a nearby parking lot); *Walker*, 350 Ga. App. at 175-76 (2) (concluding that officer had reasonable suspicion defendant might be involved in criminal conduct when officer initially observed defendant attempting to load large television into trunk of car that was parked partially in grass on side of street, where only houses in immediate vicinity were located on other side of a wooded area, and when the officer pulled up behind car, car's driver sped off, leaving defendant). *Cf. Bien-Aime v. State*, 361 Ga. App. 645, 651-52 (1) (865 SE2d 224) (2021) (holding that a police officer on routine patrol—as opposed to waiting at a specific time and place as part of a sting operation—witnessing a suspect fitting a pattern of criminal behavior in a high-crime area was not sufficient to provide a reasonable, articulable suspicion to detain the suspect). The dissent disagrees the patrol officer had reasonable, articulable suspicion to justify a traffic stop of Baggett's vehicle, characterizing the detention as based on

12

(b) *Prolonging the Traffic Stop.* Baggett also maintains his trial counsel should have filed a motion to suppress on the ground that the initial traffic stop of his vehicle was unlawfully prolonged. And to be sure, the Fourth Amendment's protection of a person's right to be secure against unreasonable searches and seizures "extends to the investigatory stop of a vehicle, which cannot be unreasonably prolonged beyond the time required to fulfill the purpose of the stop."[21] But a reasonable stop "generally includes the time necessary to verify the driver's license, insurance, registration; to complete any paperwork connected with the citation or a written warning; and to run a computer check to determine whether there are any outstanding arrest warrants for

a mere "hunch." As discussed *supra*, we do not agree the *objective* factors observed by the officers—which lead to the traffic stop—can be fairly characterized as a hunch. Importantly, neither Sergeant Pledger nor the patrol officer used the term "hunch" at trial when describing the traffic stop. That term was used by *appellate counsel* in his questioning of the patrol officer during the hearing on the motion for new trial, with the officer then repeating the term and characterizing the stop as "more of a hunch in my mind *and rose to the level of reasonable suspicion*." Finally, it bears repeating that it was Pledger who directed the officer to conduct the stop based on *her* reasonable, articulable suspicion.

[21] *Betancourt v. State*, 322 Ga. App. 201, 204 (2) (a) (744 SE2d 419) (2013) (punctuation omitted); *see Salmeron v. State*, 280 Ga. 735, 736 (1) (632 SE2d 645) (2006) (noting that detention or seizure can become unlawful under the Fourth Amendment if it is unreasonably prolonged).

the driver or the passengers."[22] Additionally, while performing these tasks, the officer "may question the occupants and request consent to conduct a search of the vehicle, so long as the officer's questioning does not impermissibly prolong the otherwise lawful detention."[23] And importantly, information learned during the course of a traffic stop may provide a law enforcement officer "with a reasonable, articulable suspicion to prolong the traffic stop."[24]

Here, almost immediately after initiating the traffic stop, the patrol officer—as shown on his body-camera video—asked Baggett why he had driven to Midway Park, but Baggett could provide no reason. Approximately five minutes later, Baggett acknowledged that he had most likely been pulled over for "messing with someone

---

[22] *Betancourt*, 322 Ga. App. at 204 (2) (a) (punctuation omitted); *see Salmeron*, 280 Ga. at 737 (1) ("It does not unreasonably expand the scope or duration of a valid traffic stop for an officer to prolong the stop to immediately investigate and determine if the driver is entitled to continue to operate the vehicle by checking the status of the driver's license, insurance, and vehicle registration." (punctuation omitted)).

[23] *Betancourt*, 322 Ga. App. at 204-05 (2) (a) (punctuation omitted); *see Salmeron*, 280 Ga. at 736 (1) ("[T]he dispositive factor . . . is not the nature or subject of the officer's questioning, but whether that questioning took place during [an] otherwise lawful detention for committing the traffic violations in the officer's presence[;][i]f a driver is questioned and gives consent while he is being lawfully detained during a traffic stop, there is no Fourth Amendment violation.").

[24] *Rocha v. State*, 317 Ga. App. 863, 867 (1) (733 SE2d 38) (2012).

[he] shouldn't have." And less than three minutes later, Sergeant Pledger arrived on the scene of the traffic stop, searched Baggett's mobile phone—with his consent—and subsequently placed him under arrest after seeing the texts. Thus, as Baggett concedes, only about ten minutes elapsed between the time the officer stopped Baggett and the time Pledger arrested him. More importantly, Baggett's responses to the officer's questions provided the officer with a reasonable, articulable suspicion to prolong the traffic stop.[25]

(c) *Miranda Violation*. Baggett further claims his trial counsel should have filed a motion to suppress on the ground that his statements to the patrol officer occurred while he was in custody but without the benefit of *Miranda*[26] warnings. Of

---

[25] *See Hall*, 351 Ga. App. at 700-01 (1) (holding that following traffic stop based on reasonable suspicion, state trooper's smelling of marijuana authorized prolonging the stop); *Betancourt*, 322 Ga. App. at 204-05 (2) (a) (explaining that investigatory stop of vehicle with unlawfully dark window tinting, during which defendants consented to a search of vehicle approximately 20 minutes after initial stop, was not unreasonably prolonged beyond the time required to fulfill the purpose of the traffic stop); *Rocha*, 317 Ga. App. at 867 (1) (concluding that information deputy learned during the course of the traffic stop, including inconsistencies in defendants' stories, provided him with a reasonable, articulable suspicion to prolong the traffic stop).

[26] *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (III) (86 SCt 1602, 16 LE2d 694) (1966) (holding that the Fifth Amendment bars the admission of an accused's statements made during a custodial interrogation, unless he first is advised of and voluntarily waives his right to remain silent and not incriminate himself); *see also*

course, the test to ascertain whether a detainee is in custody for *Miranda* purposes is "whether a reasonable person in the detainee's position would have thought the detention would not be temporary."[27] And the safeguards prescribed by *Miranda* become applicable "only after a detainee's freedom of action is curtailed to a degree associated with formal arrest."[28] But importantly,

> [w]hether a suspect is in custody does not depend upon the subjective views harbored by either the interrogating officers or the person being questioned. Instead, the only relevant inquiry is how a reasonable person in the suspect's position would have understood the situation. A reasonable person is one neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances.[29]

U.S. CONST. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."); GA. CONST. Art. 1, § 1, ¶ XVI ("No person shall be compelled to give testimony tending in any manner to be self-incriminating.").

[27] *Wright v. State*, 362 Ga. App. 867, 870 (1) (870 SE2d 484) (2022) (punctuation omitted); *accord Owens v. State*, 308 Ga. App. 374, 378 (2) (707 SE2d 584) (2011).

[28] *Wright*, 362 Ga. App. at 870 (1) (punctuation omitted); *accord Owens*, 308 Ga. App. at 378 (2); *see Miranda*, 384 U.S. at 477 (III) (explaining that protections of that decision apply "when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way").

[29] *Wright*, 362 Ga. App. at 870 (1) (punctuation omitted); *accord Chavez-Ortega v. State*, 331 Ga. App. 500, 502-03 (1) (771 SE2d 179) (2015).

Consequently, a custodial situation does not arise "even if an officer believes he has probable cause to arrest a defendant, [when] the officer takes no overt step to communicate that belief."[30]

Here, Baggett asserts that he was essentially under arrest after the patrol officer took his driver's license to run a check on it immediately following the traffic stop and, therefore, the officer should have provided him with *Miranda* warnings at that point. But generally, "mere roadside questioning during a traffic stop does not constitute a custodial situation."[31] And while Baggett was not free to leave after the officer took his license, there is no evidence that—at any time between the initial stop and the actual arrest—the officer made any statement or took any action that would cause a reasonable person in Baggett's position to believe his freedom was restrained to the degree associated with a formal arrest. Indeed, in the ten-minute period between the initial stop and his actual arrest, during which Baggett guessed that he had been pulled over for "messing with someone [he] shouldn't have[,]" Baggett was

---

[30] *Wright*, 362 Ga. App. at 870 (1) (punctuation omitted); *accord Pugh v. State*, 323 Ga. App. 31, 37 (2) (747 SE2d 101) (2013).

[31] *Licata v. State*, 305 Ga. 498, 500 (1) (826 SE2d 94) (2019); *see Bryant v. State*, 320 Ga. App. 838, 839 (1) (740 SE2d 772) (2013) ("As a general rule, although a motorist is deprived of his freedom of action during a traffic stop, such detention is insufficient to trigger the rights set forth in *Miranda*." (punctuation omitted)).

not handcuffed, secured in the back of a police vehicle, or treated in any manner that would raise the investigative stop to the level of an arrest. So, although Baggett argues the officer's questions amounted to a custodial interrogation, he cannot cite to any precedent holding that "the subjectively accusatory or incriminating nature of an officer's question (from the officer's point of view) during an initial, on-the-scene investigation—standing alone—is sufficient to transform a non-custodial situation into a 'custodial interrogation' for purposes of the *Miranda* requirements."[32]

---

[32] *Wright*, 362 Ga. App. at 873 (1) (c) (footnote omitted); *see id.* at 875-76 (1) (c) (holding that defendant was not in custody for *Miranda* purposes despite the fact that officer, having already found suspected drugs on top of bag, subjectively may have perceived his subsequent question regarding contents of bag as being aimed at establishing defendant's guilt and defendant—assuming that he knew of bag's contents—subjectively may have perceived that question in the same way); *Oh v. State*, 345 Ga. App. 729, 732-33 (1) (815 SE2d 95) (2018) (finding that no *Miranda* warning was required because defendant was not in custody when he took breath test even though officer indicated to defendant after traffic stop that he believed defendant was impaired given that officer never indicated he would be arrested regardless of test); *State v. Price*, 322 Ga. App. 778, 781-82 (746 SE2d 258) (2013) (concluding that defendant was not under arrest for *Miranda* purposes when he exited vehicle and was placed in handcuffs, given that officer told him that he was not under arrest but that he was only being detained while officer completed his investigation); *Bryant*, 320 Ga. App. at 839-40 (1) (holding that defendant was not in custody for *Miranda* purposes despite officer discovering that his license was suspended in light of fact defendant was not handcuffed or put in back of police vehicle and officer made no statement that would cause a reasonable person to believe they were arrested).

18

In sum, we do not agree the patrol officer lacked reasonable articulable suspicion to initiate the traffic stop of Baggett's vehicle or that the officer unlawfully prolonged the stop. Furthermore, we similarly are unpersuaded that Baggett was in custody for *Miranda* purposes following the traffic stop at any time prior to the point at which Sergeant Pledger did, in fact, place him under arrest and provide him with those warnings. Given these circumstances, there was no legal basis to exclude any of the evidence law enforcement officers obtained as a result of the traffic stop and any motion to suppress them would have been futile.[33] Accordingly, the trial court did not err in denying Baggett's claim that his trial counsel rendered ineffective assistance by failing to file such a motion.

2. Baggett also maintains the trial court erred in failing to properly instruct the jury as to the offense of trafficking-persons-for-sexual-servitude, or alternatively,

---

[33] *See Walker*, 350 Ga. App. at 177-78 (2) (b) (holding that because officer's brief investigatory detention of defendant was based on reasonable suspicion that defendant was involved in criminal conduct, a motion to suppress would have lacked merit and, therefore, trial counsel was not ineffective for failing to file such motion); *Donnell v. State*, 285 Ga. App. 135, 137-38 (2) (645 SE2d 135) (2007) (concluding that because defendant was not arrested when he made inculpatory statement, a motion to suppress would have been futile and, thus, defendant failed to show trial counsel rendered ineffective assistance by failing to file such motion).

19

denying his claim that his counsel rendered ineffective assistance by failing to object to the court's instruction. Yet again, we disagree.

Importantly, and perhaps obviously given his alternative ineffective assistance claim, Baggett did not object to any of the particular portions of the trial court's jury charges, which he now cites as constituting error. Under OCGA § 17-8-58, "[a]ny party who objects to any portion of the charge to the jury or the failure to charge the jury shall inform the court of the specific objection and the grounds for such objection before the jury retires to deliberate."[34] The failure to so object precludes "appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects the substantial rights of the parties."[35] In such cases, as the Supreme Court of Georgia has explained, "the proper inquiry is whether the instruction was erroneous, whether it was obviously so, and whether it likely

---

[34] OCGA § 17-8-58 (a).

[35] OCGA § 17-8-58 (b); *see also Alvelo v. State*, 290 Ga. 609, 614 (5) (724 SE2d 377) (2012) (holding that OCGA § 17-8-58 (b) requires an appellate court to review for plain error an alleged jury-instruction error to which no objection was raised at trial); *Issa v. State*, 340 Ga. App. 327, 336 (4) (796 SE2d 725) (2017) (same).

affected the outcome of the proceedings."[36] Consequently, because Baggett failed to

object to the trial court's jury instructions, our review is limited to consideration in

this regard.[37] Importantly, as our Supreme Court has emphasized, satisfying the

plain-error standard "is difficult, as it should be."[38] And the burden of establishing

plain error "falls squarely on the defendant."[39]

Turning to the offense at issue, OCGA § 16-5-46 (c) (2) provides as follows:

"A person commits the offense of trafficking an individual for sexual servitude when

---

[36] *Alvelo*, 290 Ga. at 615 (5) (punctuation omitted); *accord Issa*, 340 Ga. App. at 336 (4); *see Williams v. State*, 306 Ga. 717, 720 (2) (832 SE2d 805) (2019) ("When reviewing a jury instruction for plain error that has not been affirmatively waived, the proper inquiry is whether the instruction was erroneous, whether it was obviously so, and whether it likely affected the outcome of the proceedings." (punctuation omitted)).

[37] *See* OCGA § 17-8-58 (b); *see also Russell v. State*, 309 Ga. 772, 782 (3) (a) (848 SE2d 404) (2020) (holding that because defendant's trial counsel failed to object to the pretrial jury charge, defendant's argument that the charge was inadequate is limited to a review of the charge for plain error).

[38] *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) (punctuation omitted) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (II) (129 SCt 1423, 173 LE2d 266) (2009)).

[39] *State v. Crist*, 341 Ga. App. 411, 415 (801 SE2d 545) (2017); *see Anderson v. State*, 299 Ga. 193, 196 (2) (787 SE2d 202) (2016) ("To show plain error, [the defendant] must establish not only that the jury instruction was erroneous, but also that it was obviously so and that it likely affected the outcome of the proceedings." (punctuation omitted)).

21

that person knowingly . . . [r]ecruits, entices, harbors, transports, provides, solicits, patronizes, or obtains by any means an individual for the purpose of sexual servitude[.]" And OCGA § 16-5-46 (a) (8) (C) defines "sexual servitude" as "any sexually explicit conduct or performance involving sexually explicit conduct for which anything of value is directly or indirectly given, promised to, or received by any individual, which conduct is induced or obtained . . . [f]rom an individual whom the accused believes to be under the age of 18 years[.]"

In this matter, in Count 1 of the indictment, the State charged Baggett with violating OCGA § 16-5-46 (c), alleging that on March 30, 2020, he "did knowingly recruit, entice, harbor, transport, provide, solicits, patronize, and obtain by any means another person, to wit: 'Becca,' portrayed by [Sergeant Pledger] and believed by the accused person to be under the age of 18 years, for the purpose of sexual servitude . . . ." And after the parties rested, the trial court began its charge by reading the entire indictment and, subsequently, provided the jury with the following instruction on this offense:

> Count 1 of the indictment charges this defendant with trafficking of persons for sexual servitude. In that regard, I charge you as follows: A person commits the offense of trafficking an individual for sexual servitude when that person knowingly, (1) subjects an individual to or

22

maintains an individual in sexual servitude; or, (2) recruits, entices, harbors, transports, provides, solicits, patronizes or obtains by any means an individual for the purpose of sexual servitude; or, (3) benefits financially or by receiving anything of value from the sexual servitude of another.

In his motion for new trial and on appeal, Baggett asserts the trial court committed plain error by failing to also instruct the jury on the definition of sexual servitude under OCGA § 16-5-46 (a) (8) (C), arguing that in omitting this definition, it failed to provide an essential element of the offense. But while the better practice certainly would have been to provide the jury with this definition, we are not persuaded its omission amounted to plain error. Significantly, in reviewing a challenge to the trial court's jury instructions, we view the charge "as a whole to determine whether the jury was fully and fairly instructed on the law of the case."[40]

In this case, viewing the jury instructions in context, the trial court informed the jury that Baggett was indicted for trafficking of persons for sexual servitude, instructed the jury that the indictment and the plea formed the issues to be decided, properly instructed the jury that it could only find Baggett guilty if it found beyond

---

[40] *Walker v. State*, 308 Ga. 33, 36 (2) (838 SE2d 792) (2020) (punctuation omitted); *accord Martin v. State*, 310 Ga. 658, 664 (3) (852 SE2d 834) (2020).

23

a reasonable doubt that he committed the charged offenses as alleged in the indictment (which required finding that he believed "Becca" to be under the age of 18 years), and gave a copy of the indictment to the jury to use during its deliberations. And importantly, when a charge as a whole "substantially presents issues in such a way as is not likely to confuse the jury even though a portion of the charge may not be as clear and precise as could be desired, a reviewing court will not disturb a verdict amply authorized by the evidence."[41] Accordingly, even assuming the trial court should have instructed the jury on the definition of sexual servitude, Baggett has not shown that the trial court's mistake affected his substantial rights in such a manner as to affect the outcome of the trial court proceedings, or that it confused the jury in any way; and therefore, it did not constitute plain error.[42]

---

[41] *Williams v. State*, 353 Ga. App. 821, 827 (3) (b) (840 SE2d 32) (2020) (punctuation omitted); *accord Robards v. State*, 350 Ga. App. 46, 57 (3) (828 SE2d 9) (2019).

[42] *See Morris v. State*, 308 Ga. 520, 529-30 (4) (842 SE2d 45) (2020) (finding that the charge given by the trial court was not error as it was an accurate statement of the law that was properly adjusted to the evidence and circumstances of the case, and defendant offered no evidence that the jury was confused or misled by this instruction); *Curry v. State*, 330 Ga. App. 610, 617-18 (2) (768 SE2d 791) (2015) (holding that even if the trial court erred in part of its charge, it cured any defect by instructing the jury that the State must prove every material allegation in the indictment beyond a reasonable doubt, the jury could only find the defendant guilty if it found beyond a reasonable doubt that he committed the crime charged, and

Furthermore, Baggett alternatively contends his counsel rendered ineffective assistance by neglecting to object to the trial court's failure to provide the jury with the definition of sexual servitude. But as we just explained, the trial court's instruction did not constitute plain error. Consequently, even if we assume that trial counsel performed deficiently by failing to object to that instruction, Baggett has not established that "any such deficiency resulted in prejudice, as the test for prejudice in the ineffective assistance analysis is equivalent to the test for harm in plain error review."[43]

---

sending the indictment out with the jury during its deliberations); *Wheeler v. State*, 327 Ga. App. 313, 319-20 (3) (758 SE2d 840) (2014) (finding that trial court's jury instructions in their entirety, including that jury could only find the defendant guilty if it found beyond a reasonable doubt that he committed the offenses as described in the indictment, cured any potential error), *overruled on other grounds by Willis v. State*, 304 Ga. 686 (820 SE2d 640) (2018); *Smith v. State*, 314 Ga. App. 583, 586-57 (2) (724 SE2d 885) (2012) (concluding that since "the trial court properly limited the elements of the crimes to those charged in the indictment," defendant did not show reversible error). We disagree with the dissent's assertion that a case involving allegations in an indictment of a defendant attempting to exchange payment for sex with someone he believes is underage (and facts supporting those same allegations) was confusing to the jury because "servitude" was not explicitly defined.

[43] *Knighton v. State*, 310 Ga. 586, 597 (2) (c) (853 SE2d 89) (2020) (punctuation omitted); *accord Roberts v. State*, 305 Ga. 257, 265 (5) (a) (824 SE2d 326) (2019); *see Williams v. State*, 304 Ga. 455, 460 (3) n.4 (818 SE2d 653) (2018) (explaining that the test for harm under plain error review is equivalent to the test in ineffective assistance of counsel cases for whether an attorney's allegedly deficient performance has resulted in prejudice of constitutional proportions).

3. Finally, Baggett contends the trial court erred in failing to properly instruct the jury on the criminal-attempt-to-commit-child-molestation charge. Once again, we disagree the trial court committed reversible error.

Under OCGA § 16-4-1, "[a] person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime." And OCGA § 16-6-4 (a) (1) provides: "A person commits the offense of child molestation when such person . . . [d]oes an immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person . . . ."

In this matter, Baggett also did not object to the trial court's instruction on this issue and, thus, we are again limited to a review of the instruction for plain error.[44] Bearing that in mind, Count 2 of the Indictment charged Baggett with violating OCGA § 16-4-1, alleging that on March 30, 2020, he

> did knowingly and intentionally attempt to commit the crime of Child
> Molestation in violation of . . . [OCGA § 16-6-4]. . . in that the said
> accused did engage in text messages with 'Becca,' a person the accused
> believed to be a 14 year old child, and the accused did travel to Floyd

---

[44] *See supra* note 37 & accompanying text.

County with the intention of engaging in sexual relations with said child, with the intent to arouse and satisfy the sexual desires of the accused and the child, said acts constituting a substantial step toward the commission of said crime . . . .

And during the jury charge, the trial court instructed on this issue as follows:

Count 2 of the indictment charges the defendant with criminal attempt to commit child molestation. In that regard, I charge you as follows: A person commits criminal attempt to commit child molestation when with intent with intent to commit child molestation that person performs any act that constitutes a substantial step towards the commission of the crime of child molestation.

I further charge you that child molestation is defined as follows: A person commits the offense of child molestation when that person does an immoral or indecent act to or in the presence of or with a child less than sixteen years of age with intent to arouse or satisfy the sexual desires of the person or the child.

In his motion for new trial and on appeal, Baggett argues this instruction amounted to plain error because the trial court did not repeat verbatim the allegation in the indictment that the jury must find he believed "Becca" to be "a 14 year old child." But as discussed in Division 2, *supra*, we view the charge "as a whole to

27

determine whether the jury was fully and fairly instructed on the law of the case."[45] Once again, the trial court instructed the jury that the indictment and the plea formed the issues to be decided; and it explicitly instructed the jury that it could only find Baggett guilty if it found beyond a reasonable doubt that he committed the charged offenses as alleged in the indictment, which required—as Baggett even notes in his brief—finding that he believed "Becca" to be a 14-year-old child. In addition, the court gave a copy of the indictment to the jury to review during its deliberation, which contained the language Baggett argues should have been included in the charge. Given these circumstances, the trial court's instruction on the criminal-attempt-to-commit-child-molestation charge was not plain error.[46]

For all these reasons, we affirm Baggett's convictions and the denial of his motion for new trial.

*Judgment affirmed. Pipkin, concurs. Rickman, C. J. dissents.*

---

[45] *Walker*, 308 Ga. at 36 (2) (punctuation omitted); *accord Martin*, 310 Ga. at 664 (3).

[46] *See supra* note 42 & accompanying text.

A23A0263. BAGGETT v. THE STATE.

RICKMAN, Chief Judge, dissenting.

My review of the record brings me to a different conclusion than that reached in the majority opinion. It does not appear to me that the Floyd county officers had a reasonable, articulable suspicion that the driver of the pickup truck was the same person who wanted to meet and pay for sex with a person they believed to be a minor. I believe that appellant has shown his trial counsel was ineffective in failing to file a motion to suppress. I therefore, respectfully dissent.

As noted in the majority opinion, the undercover officer and Baggett exchanged text messages and arranged to meet at the tennis courts in a public park.

Upon arrival at the park, the undercover officer noticed another vehicle parked near the tennis courts. The undercover officer texted Baggett and asked if he had already arrived. Baggett replied that he had not yet arrived and he was driving a white Honda Pilot. Shortly after the arranged meeting time had passed, the undercover officer texted Baggett to ask where he was and received no response.

The undercover officer and other officers then observed a red pick up truck enter the park. That truck did not head to the arranged meeting place at the tennis courts, but instead turned down another road in the park leading to the trash dump before making a u-turn and exiting the park. A patrol officer stopped Baggett's vehicle approximately 15 minutes later.

There is no evidence in the record that Baggett committed a traffic violation and the officer who stopped Baggett testified at the motion for new trial hearing that *anyone* who drove around the dump as Baggett did would have been pulled over. The officer did not have a description of the person who was supposed to meet the undercover officer, did not know if the subject texting the undercover officer was a man or woman, did not know the race of the subject, and the vehicle that Baggett said he would be driving did not match the vehicle that turned around near the dump. Here, I do not see how the officer had a particularized and objective basis for

suspecting Baggett of criminal activity. The officer only had a hunch. In fact, he testified at the hearing on Baggett's motion for new trial that he had a hunch. The fact that the hunch ultimately turned out to be accurate is not of consequence to our analysis.

"What is demanded of the police officer, as the agent of the state, is a founded suspicion, some necessary basis from which the court can determine that the detention was not arbitrary or harassing." (Citation and punctuation omitted.) *Berry v. State*, 248 Ga. App. 874, 880 (3) (547 SE2d 664) (2001). A hunch is not sufficient. See *Bien-Aime v. State*, 361 Ga. App. 645, 648-654 (1) 865 SE2d 224 (2021) (finding no reasonable, articulable suspicion for a traffic stop where the defendant drove into a restaurant parking lot in a high crime area and promptly exited with a panicked look on his face when he observed a marked police vehicle); see also *Runnells v. State*, 357 Ga. App. 572, 576 (851 SE2d 196) (2020) (holding there was no reasonable articuable suspicion of criminal activity where a person speaking with the defendant at the driver's side door of the defendant's car fled the scene of a high crime area known for drug activity when he observed a narcotics officer); *Berry*, 248 Ga. App. at 880-881(3) (holding that a traffic stop was not authorized solely because the driver of the vehicle had a drive out tag and the officer testified that they intercept a lot of

stolen vehicles in that manner). Accordingly, I think that Baggett's trial counsel

performed deficiently for failing to file a motion to suppress evidence obtained as a

result of Baggett's traffic stop and that the deficient performance prejudiced him

because there is a reasonable likelihood that but for his trial counsel's failure to file

the motion, the evidence underlying the prosecution's case that was gained at the

impermissible traffic stop would have been suppressed.[1]

---

[1]

Given my conclusion that Baggett's trial counsel performed deficiently for failing to file a motion to suppress, I need not address Baggett's claims regarding jury instructions. But I feel compelled to mention that, even though the plain error standard is very difficult to overcome, I also am concerned about the trial court's failure to charge the jury on the definition of sexual servitude. The majority opinion recognizes this failure, but holds that the charge as a whole presented the issues in a way not likely to confuse the jury because the trial court informed the jury that Baggett was indicted for trafficking of persons for sexual servitude, instructed the jury that the indictment and the plea formed the issues to be decided, properly instructed the jury as to the beyond a reasonable doubt standard, and gave a copy of the indictment to the jury. The problem with this reasoning is that the term sexual servitude is used throughout the indictment, but the term is never defined and is beyond the ken of the average juror.

4